# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº -09-CR-580 (JFB)

_____

### UNITED STATES,

VERSUS

### TERRANCE BARLOW,

Defendant.

_____

**MEMORANDUM AND ORDER**
August 5, 2010

_____

JOSEPH F. BIANCO, District Judge:

On October 20, 2009, a jury convicted defendant Terrance Barlow ("Barlow" or "defendant") of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g). Barlow now moves for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

Barlow asserts that he should be granted a new trial on three grounds. First, he argues that the jury's verdict was against the weight of the evidence. Specifically, he argues that the testimony of two police officers involved in his arrest was incredible and that the jury failed to properly credit the testimony of two defense witnesses who testified that the gun containing the ammunition actually came from someone else arrested during the police response to an attempted burglary. Second, Barlow contends that the prosecution violated its obligation to disclose exculpatory and impeachment evidence in its possession. The focus of Barlow's argument on this ground is that the prosecution allegedly failed to disclose the existence of potential defense witnesses and hampered defense access to those witnesses. Third, Barlow asserts a violation of his Sixth Amendment right to a jury drawn from a fair cross section of the community. Specifically, Barlow points out that his 60-person venire did not contain a single African-American man, although it did contain 11 African-American women, two of whom were ultimately seated on the jury.

As set forth below, the Court finds that each of these claims is without merit and that no evidentiary hearing is needed to resolve any of them. First, the Court concludes that the guilty verdict on the felon-in-possession of ammunition charge was not against the weight of the evidence. The government presented,

*inter alia*, the following evidence to the jury: (1) the eyewitness testimony of Police Officer John Serdaros and Sergeant Vassilios Aidiniou that the loaded gun fell from Barlow's waistband during a brief struggle between Barlow and Officer Serdaros as they attempted to stop Barlow in response to a burglary in progress on July 16, 2009; (2) the testimony that the defendant orally confessed to Officer Serdaros that he possessed the firearm and then confessed, in writing, to Detective Roland Garcia that he possessed the gun in connection with the attempted burglary/robbery; and (3) a defense stipulation that the ammunition recovered from the firearm had been transported in interstate commerce and that the defendant had been convicted of a felony prior to July 16, 2009. Although Barlow argues that the jury should have accepted the testimony of the defense witnesses over the police officers, Barlow has failed to demonstrate the "exceptional circumstances" that are required before the Court will disturb the jury's credibility assessments, nor has he demonstrated that it would be a manifest injustice to let the jury's verdict stand. Based upon the government's cross-examination of the two defense witnesses, as well as the other proof at trial, the jury could have rationally concluded that the defense witnesses' testimony should be rejected, *inter alia*, because they were not in a position to observe the defendant's arrest or because the testimony was based upon an honest, but erroneous, perception that the firearm was recovered from a second individual arrested on the street (an erroneous perception that may have been caused by Officer Serdaros assisting in the arrest of the second individual while he was still holding the gun that had fallen from defendant's waistband in his hand ). Thus, the Court denies the Rule 33 motion based upon the weight of the evidence.

Second, the Court also rejects defendant's claim that purported *Brady* violations by the government warrant a new trial. As a threshold matter, defendant has failed to produce any evidence that the government possessed evidence favorable to the defense prior to trial or violated its discovery obligations in any way. In any event, Barlow was not prejudiced at all by any purported late disclosure of exculpatory information during trial because (1) the government served subpoenas on the witnesses who are the focus of Barlow's *Brady* argument, (2) the witnesses in question in fact testified for Barlow at trial and the jury heard and fully considered the exculpatory information, and (3) any purported late disclosure did not result in any material shift in Barlow's trial strategy. By calling these defense witnesses, Barlow's counsel was fully able to present the allegedly exculpatory information to the jury in the best possible light for the defendant. Furthermore, upon learning during the trial of the anticipated exculpatory testimony of these two witnesses, Barlow's counsel did not request an adjournment of the trial (or a mistrial) because of any purported prejudice prompted by the timing of the discovery of the information. Therefore, no "suppression" of exculpatory information occurred within the meaning of *Brady* because of any purported late disclosure. In any event, even if Barlow could show that the government suppressed exculpatory evidence, he cannot possibly show the requisite resulting prejudice under the circumstances of this case because the defendant had full and effective use of the exculpatory evidence at trial, and no hearing on this issue is required. Similarly, the Court finds meritless Barlow's assertion that the prosecution failed to disclose potential impeachment evidence relating to a prosecution witness. Therefore, Barlow is not

entitled to a new trial because of the prosecution's alleged belated disclosure or non-disclosure of exculpatory or impeachment evidence.

Finally, the Court rejects Barlow's fair cross-section challenge to the jury venire in this case. Applying the test set out by the Supreme Court in *Duren v. Missouri*, 439 U.S. 357 (1979), the Court concludes that no fair cross-section violation occurred. In particular, assuming *arguendo* that African-American males constitute a "distinctive group" for purposes of the *Duren* test (in addition to African Americans generally, who are clearly a "distinctive group" under *Duren*), Barlow has not met his burden of showing that African-American males were unfairly underrepresented in jury venires or that any underrepresentation resulted from the systematic exclusion of African-American males from jury service. As discussed in detail *infra*, although Barlow's venire contained no African-American males, it is undisputed that African-American males comprised 6.79% of all venires in the District during the relevant period. In fact, African-American males were actually qualified for jury service in this District during the time period in question at a higher rate than other groups in the community. No hearing on this issue is warranted because, *inter alia*, based upon the undisputed statistical evidence, it is clear that the "unfair underrepresentation" element cannot be met in this case as a matter of law.

In sum, having carefully reviewed all of Barlow's claims, the Court concludes that no hearing is required on any of the issues and that the claims in defendant's Rule 33 motion are without merit. The Court sees no "manifest injustice" in allowing this verdict to stand and has no "real concern that an innocent person may have been convicted" in this case. *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotations omitted).

## I. BACKGROUND

As will be discussed more fully below, the New York City Police ("NYPD") arrested Barlow on July 16, 2009. He was subsequently transferred to federal custody and indicted on August 18, 2009 on one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g). Trial began on October 13, 2009, and the jury found Barlow guilty on October 20, 2009. On November 20, 2009, Barlow filed the instant motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

At the same time he submitted his reply brief on the motion, defense counsel requested that the Court hold oral argument regarding Barlow's fair cross-section claim. The Court granted that request and held oral argument on March 26, 2010. Following oral argument, both sides made several additional submissions dealing with the fair cross-section issue. The matter is now fully submitted.

## II. STANDARD OF REVIEW

Defendant moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. Rule 33 states, in relevant part, that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "'extraordinary circumstances,'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal citation and quotation omitted), and only if there exists "'a real concern that an innocent person may have

been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d. Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134.

### III. DISCUSSION

Barlow argues that he is entitled to a new trial on three grounds: (1) the verdict was not supported by the weight of the evidence; (2) the prosecution violated its obligation to disclose exculpatory and impeachment information; and (3) the jury was not drawn from a fair cross section of the community. As set forth below, the Court concludes that these claims are without merit and Barlow has failed to demonstrate that he is entitled to relief under Rule 33.

### A. Weight of Evidence Claim

#### 1. Background: The Evidence

The crime of which Barlow was convicted—being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)—has three elements: (1) the knowing possession of ammunition; (2) a prior felony conviction; and (3) the possession "being in or affecting" interstate commerce. *United States v. Amante*, 418 F.3d 220, 221 n.1 (2d Cir. 2005); *see also* 18 U.S.C. § 922(g). At Barlow's trial, the parties stipulated to both the prior felony conviction and interstate commerce elements. The only issue, therefore, was whether Barlow knowingly possessed ammunition.

#### a. Testimony of the Police Officers Regarding the Stop and Arrest

Trial began on October 13, 2009. The government's first witness was John Serdaros, a New York City Police officer assigned to the 67th Precinct. Serdaros testified that, on the afternoon of July 16, 2009, he was on patrol with his partner, Sergeant Vassilios Aidiniou, in an unmarked police car. The officers received a call from the police dispatcher advising them of a burglary in progress at 678 Rogers Avenue, involving six males and one female. (Tr. 39.) Serdaros testified that, upon arriving at that address with the flashing lights activated on his unmarked car, he observed Barlow on the street in front of the alleyway that ran alongside 678 Rogers Avenue. (Tr. 41-42, 46.) Serdaros stated that, as he approached, Barlow appeared to be speaking to someone in an alleyway over his right shoulder. Barlow "immediately locked eyes" with Serdaros, "all the time" keeping his right hand against his right waistband "as if he was trying to hold something against it." (Tr. 42-43.) After Serdaros and Barlow locked eyes, Barlow began walking southbound on the sidewalk. (Tr. 46-47.) Serdaros got out of his car, told Barlow to stop, and, after approaching Barlow, grabbed Barlow's left arm. (Tr. 47.) Barlow attempted to "tug away" from Serdaros. (Tr. 48.) Serdaros lost his grip on Barlow but, according to Serdaros, Barlow's shirt came off, and a gun fell to the ground. (Tr. 48.) Serdaros testified that he picked the gun up while Barlow ran south on Rogers Avenue. (Tr. 48.) Additional uniformed NYPD officers who had arrived on the scene apprehended Barlow in the street as he ran from Serdaros. (Tr. 48-49.)

Serdaros testified that he then observed Sergeant Aidiniou, his partner, attempting to arrest another individual, later identified as Davon Mattocks, on the same sidewalk on Rogers Avenue.[1] (Tr. 54.) Serdaros stated that he assisted Aidiniou in handcuffing Mattocks, while still holding in his hand the gun that he had just seized after it had fallen to the sidewalk from Barlow's waistband. (Tr. 80, 103.) Serdaros testified that the defendant's gun remained in his hand until he had an opportunity to safeguard it in his unmarked vehicle. (Tr. 80.) Serdaros later examined the gun and determined that it contained seven rounds of ammunition. (Tr. 52.)

Serdaros also testified that Barlow was taken to the 67th Precinct, where Serdaros gave him his Miranda warnings and had a conversation with him. (Tr. 70-71.) During that conversation, according to Serdaros, Barlow stated that an individual named "Buck" had given him the gun to use in the planned burglary of 678 Rogers Avenue. (Tr. 72.)

The government also called Sergeant Aidiniou, Serdaros's partner. Aidiniou testified that, when he and Serdaros arrived on the scene, he observed Barlow "pressing something up against the right side of his body with his right hand, trying to hold something there." (Tr. 296.) Aidiniou stated there was a "slight struggle" between Serdaros and Barlow and that Barlow "kind of spun out of Officer Serdaros['s] grasp . . . like spinning out of his shirt . . . . I saw a gun fall to the ground." (Tr. 299.) Aidiniou asserted that he saw Serdaros pick the gun up. (Tr. 304.) Aidiniou then

proceeded to arrest Mattocks. He was assisted by "a couple of . . . uniformed officers," but could not say whether Serdaros was one of the officers who assisted him. (Tr. 356-57.)

### b. Testimony Regarding Barlow's Confession

Detective Roland Garcia of the NYPD also testified for the government. Garcia stated that he was called to the 67th Precinct on the night of July 16, 2009. (Tr. 453-54.) Garcia met with Barlow and gave him the Miranda warnings. (Tr. 456-57.) According to Garcia, Barlow began to write a statement but started to shake and cry and was unable to continue writing. (Tr. 478.) Garcia testified that Barlow said he was upset because he was afraid of "Buck." (Tr. 478-79.) Garcia then handwrote a statement that, he testified, was based on Barlow's account of the events. Barlow signed the statement, and it was introduced into evidence at trial. (Tr. 462-66.) According to the statement, "Buck" gave Barlow the gun to use in a robbery and drove Barlow to 678 Rogers Avenue. After the police arrived, Barlow attempted to walk away but was apprehended, and the gun fell to the ground. (*See id.*)

Garcia also testified that he attempted to locate "Buck" via a search of computer records but that the only individual who met Buck's description was in custody on the date of Barlow's arrest. (Tr. 466-67.)

### c. Jermaine Jackson

Due to a scheduling issue, the Court allowed the defense to call a witness before the end of the government's case. That witness, Jermaine Jackson, lived in the apartment at 678 Rogers Avenue that it was

---

[1] Aidiniou testified that Barlow was three or four feet in front of Mattocks and appeared to be trying to talk to Mattocks as he walked. (Tr. 295, 297.)

claimed was the target of the attempted burglary or robbery. Jackson testified that, on July 16, 2009, he was sitting in his apartment with two friends, Gregory Parker and Delon Joseph. (Tr. 383.) They observed people walking around outside who, they believed, had been responsible for a previous break-in at Jackson's apartment. (Tr. 383-84.) Joseph subsequently left Jackson's apartment to investigate and eventually called the police. (Tr. 386-89.) After the police arrived, Joseph called Jackson and told him to come outside to talk to the officers. (Tr. 389-90.) Jackson testified that he walked outside with Parker and that Joseph introduced him to Serdaros. While speaking with Serdaros, he "caught a glimpse" of a police officer—not Serdaros—retrieving a gun from a heavyset individual, not Barlow. (Tr. 394.) The defense would later contend that this heavyset individual was Mattocks. (*See, e.g.*, Tr. 663.) On cross-examination, Jackson admitted that, at the time of the incident, he regularly smoked marijuana (Tr. 426), but said on re-direct testimony that he had not used marijuana on July 16, 2009 (Tr. 427).

### d. Gregory Parker

The government then resumed its case. Its next witness was Gregory Parker, who was called "mainly as a rebuttal witness to Jackson's testimony." (Govt.'s Mem. of Law at 8 n.7.) Parker testified that, although he walked outside with Jackson, he, unlike Jackson, did not observe the police taking a gun off the heavyset individual (i.e., Mattocks) or anyone else. (Tr. 442-43.)

### e. Delon Joseph

The defense also called the third person who had been in the apartment at 678 Rogers Avenue—Delon Joseph. Joseph testified that, while in Jackson's apartment, he observed a number of suspicious people walking in the neighborhood, although Barlow was not one of the people he observed. (Tr. 597.) Joseph later returned to his own apartment, which was located in an adjacent building and from which he could see inside of Jackson's apartment. (Tr. 604-05.) From this vantage point, Joseph could see people on the fire escape and roof of Jackson's apartment. (Tr. 607-08.) Joseph then called the police. (Tr. 608.)

When Joseph heard the sirens of responding police cars, he exited his apartment via an interior stairwell. (Tr. 615.) As Joseph came onto Rogers Avenue, he saw the police arresting people, including a "big dude." (Tr. 616.) Joseph testified that he could see the officers searching the "big dude" and "the officer came up with a gun." (Tr. 618.) Joseph testified that defendant Barlow was not the "big dude" he saw. (Tr. 618-19.)

### 2. Barlow's Arguments

On the instant motion, Barlow concedes that the evidence was sufficient to convict him. (Def.'s Reply Mem. of Law at 9.) He argues, however, that the jury was unreasonable in making its credibility assessments, and, thus, the verdict was against the weight of the evidence. In particular, Barlow asserts that the jury was unreasonable in crediting the testimony of Officer Serdaros and Sergeant Aidiniou in light of the testimony of the defense witnesses, Jackson and Joseph. As noted above, both Jackson and Joseph testified that the gun was recovered from a heavyset individual—who the defense argues is Mattocks—and not Barlow.

### 3. Analysis

The Second Circuit recently reiterated that a criminal defendant who seeks a new trial by attacking the jury's witness credibility assessments faces a high bar. In *United States v. Bell*, 584 F.3d 478 (2d Cir. 2009), the Court explained that "[i]t is well established that trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." 584 F.3d at 483. Exceptional circumstances may be found where testimony "is patently incredible or defies physical realities." *Id.* Even if, however, the trial court rejects "all or part of the testimony of a witness or witnesses," the defendant is entitled to a new trial only if "it would be a manifest injustice to let the guilty verdict stand." *Id.*

Here, Barlow has not demonstrated the "exceptional circumstances" required for the Court to override the jury's credibility assessments With respect to the prosecution case, Barlow argues that the testimony of Officer Serdaros and Sergeant Aidiniou should not be credited because the officers gave "evasive answers to questions" and "collu[ded] during trial as they drove home together in the midst of Officer Serdaros' testimony." (Def.'s Mem. of Law at 7.) However, both witnesses were subject to a thorough cross-examination about the events of July 16, 2009. Defense counsel also asked both witnesses about their drive home together (Tr. 265-66 (Serdaros); Tr. 322-23 (Aidiniou)) and reminded the jury of this fact during summation. (Tr. 690). Therefore, the jury was able to consider any purported collusion in making its credibility assessment.

Moreover, the testimony of defense witnesses Jermaine Jackson and Delon Joseph did not—as defendant claims—"unambiguously"[2] establish that Mattocks—and not Barlow—had been carrying the gun. As an initial matter, the defense witnesses' testimony differed in important ways. First, although both testified that the officers took the gun off "the big stocky guy" or the "big dude"—who the defense argues is Mattocks—they diverged as to the identity of the officer who took the gun. Joseph testified that the gun was taken by the "bald head cop with hair on his face," (Tr. 619) who the defense argued was Serdaros. (Tr. 670-71 (summation).) Jackson, on the other hand, testified that it was another officer—not Serdaros—who pulled the gun from the "big stocky guy." (Tr. 394-95.)[3]

Second, the testimony diverged as to when the gun was recovered. Jackson testified that he was walking along the street with Officer Serdaros when he saw another officer pull the gun off the arrestee. (Tr. 394-97.) Conversely, Joseph testified that, when he saw the officer take the gun, Jackson was still on the stoop of 678 Rogers Avenue. (Tr. 630.) Moreover, Gregory Parker, who was with Jackson, testified that he never saw the police take a gun from the "heavyset person." (Tr. 442-43.)

---

[2] (Def.'s Mem. of Law at 7.)

[3] (*See* Tr. 394 ("Q: Let's back up a second. What officer did you see retrieving it from the person? A. Seeing a plainclothes officer. I can't tell you what he looked like or anything. Q: Was it Officer Serdaros you saw retrieving it from the person? A: No, it wasn't.").)

Furthermore, it was questionable whether the defense witnesses could have accurately perceived the events at issue. Neither Jackson nor Joseph witnessed Barlow's struggle with Serdaros or his arrest. Jackson testified that Barlow was already in custody and on the ground by the time he came outside. (Tr. 393.) Joseph also testified that Barlow had already been arrested when he came onto Rogers Avenue. (Tr. 627.) Additionally, in summation, the prosecutor noted that, if Jackson were standing on the stoop of 678 Rogers Avenue, he would have been 20-30 feet from the arrest of Mattocks and his view would have been obstructed by bushes. (Tr. 656.) Joseph observed the search of Mattocks from the far side of the street, and parked cars obstructed his view. (*See* Tr. 654.)

Finally, as the government pointed out in its summation, it is also possible that the defense witness Delon Joseph honestly, but erroneously, believed that the firearm was recovered from Mattocks because, according to the testimony of Officer Serdaros, once Serdaros picked up the gun that had dropped from Barlow's waistband, Serdaros immediately went over to assist Aidiniou in the arrest of Mattocks while still holding in his hand the gun that had fallen from defendant's waistband. Thus, if Joseph missed the struggle with Barlow and first saw Serdaros with the seized gun in his hand while assisting Aidiniou in arresting Mattocks, he may have honestly (but erroneously, if the police testimony was credited) concluded that the gun had been taken from Mattocks, rather than from Barlow. Thus, the jury could have simply, and rationally, rejected the defense witnesses' testimony as based on an inaccurate and/or incomplete perception of the quick-moving events on the sidewalk that day during the arrests.

In short, the testimony of Jackson and Joseph, when considered in light of the entire trial record, does not support the conclusion that the verdict was against the weight of the evidence and that a new trial is required. There was more than sufficient basis, in light of the entire trial record (including the eyewitness testimony of the two responding officers and Barlow's confession to a third officer), for the jury to rationally reject the testimony of these defense witnesses and, instead, credit the police testimony that the gun and ammunition belonged to Barlow. Thus, the jury's failure to credit this defense testimony does not amount to the exceptional circumstances required for the Court to disturb the jury's credibility assessment.[4] Given the evidence, the Court sees no manifest injustice in allowing the verdict to stand. Accordingly, Barlow's Rule 33 motion based upon the weight of the evidence is denied.

### B. *Brady* Claim

Barlow also argues that the Court should grant his Rule 33 motion because the government failed to disclose, and delayed disclosure of, exculpatory information that

---

[4] Defense counsel also asserts that, in a post-verdict conversation, a juror told him that she believed Joseph had testified that Serdaros already had the gun when he searched Mattocks. (Margulis-Ohnuma Aff. ¶ 28; Def.'s Mem. of Law at 11 n.2.) However, as defense counsel recognizes, juror testimony is not admissible to impeach a verdict. *See* Fed. R. Evid. 606; *United States v. Moten*, 582 F.2d 654, 664-65 (2d Cir. 1978); *Hernandez v. Green*, No. 05 CV 5291 (JG), 2007 WL 433396, at *6 (E.D.N.Y. Feb. 8, 2007). In any event, this evidence does not change the Court's overall view regarding the evidence at trial and the rational basis for the jury's verdict.

was in its possession and thereby violated Barlow's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. As set forth below, the Court disagrees.

### 1. Background

Before turning to the merits of Barlow's *Brady* claim, the Court will summarize the relevant factual background. As the summary reflects, because the defendant was indicted on August 18, 2009 and he refused to waive speedy trial time at the September 3, 2009 conference, there was a flurry of correspondence in a short period of time between the government and the defense regarding discovery leading up to the October 13, 2009 trial date as both sides prepared for trial.

As a threshold matter, Barlow notes that the government, in opposing Barlow's Rule 33 motion, made several factual assertions regarding the *Brady* claim in its memorandum of law, not in an accompanying affidavit. Barlow asserts, in a footnote in the reply brief, that if the Court intends to rely on any of these new factual assertions, it should hold an evidentiary hearing. (Def.'s Reply Mem. of Law at 11 n.6.) Having carefully considered this issue, the Court does not believe an evidentiary hearing is warranted for several reasons. First, as the defendant acknowledges in his reply brief, most (if not all) of the relevant facts on the *Brady* claim (as outlined in defense counsel's affirmation, the government's opposition papers, and the discovery letters/emails) are essentially uncontroverted; instead, the issues are whether the uncontroverted facts demonstrate that the information was exculpatory, whether such evidence was suppressed, and whether the defendant was prejudiced by any suppression. (*See* Def.'s Reply Mem. of Law at 11 ("The government's account of the pre-trial discovery proceedings in this case effectively confirms our contention that it suppressed exculpatory evidence. While each detail is cast in light that serves the government's end, the whole effect of the government's admissions is that its agents must have known that Joseph and Jackson would give exculpatory evidence with respect to Barlow and did everything in their power to suppress it.").) Under such circumstances, no evidentiary hearing is required. *See, e.g.*, *United States v. Byrne*, 451 F. Supp. 109, 113 (E.D. Pa. 1978) ("[I]nasmuch as the documents and affidavit filed by defendants disclose the inadequacies of the defendants' Rule 33 motion and since there was no genuine issue of material fact which had to be resolved, a hearing was not required in connection with this motion" (collecting cases)). Second, although Barlow suggests that a hearing is necessary to cross-examine government personnel (including the Assistant United States Attorney, if necessary) about pre-trial discussions with the two defense witnesses at issue, it is unclear to the Court why such a hearing would be necessary when, despite the defense having interviewed the defense witnesses and put them on the witness stand, there is no claim by any defense witness that they provided exculpatory information to the government prior to the trial. Finally, and most importantly, the Court concludes that an evidentiary hearing is not required because, even assuming *arguendo* that the government knew prior to trial that the witnesses had exculpatory information and did not disclose it (which Barlow has failed to demonstrate), this claim still fails because Barlow became aware of the exculpatory information during the trial, called the witnesses at trial, presented the exculpatory information to the jury in a complete and comprehensive manner, and suffered no prejudice at all from any alleged

lack of timely disclosure by the government. Therefore, the Court need not, and has not, relied upon any additional facts recounted in the government's brief. In short, although the Court will recount all facts presented to the Court below for purposes of completeness, the additional facts provided by the government in its opposition brief have no bearing on the Court's ultimate determination of this motion. Thus, an evidentiary hearing on the *Brady* issue is unwarranted, and defendant's request for such a hearing, made in a footnote, is denied. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 302 (2d Cir. 2006) ("Where, as here, the additional evidence of perjury is not sufficiently material to undermine confidence in the verdict, there is no need to probe the extent of the Government's awareness of the perjury."); *United States v. White*, 972 F.2d 16, 22 (2d Cir. 1992) ("Since it is not necessary to resolve the issues that might be the focus of an evidentiary hearing, the district court did not abuse its discretion in refusing to conduct an evidentiary hearing."); *United States v. Basciano*, No. 03-CR-929, 2008 WL 794945, at *6 (E.D.N.Y. Mar. 24, 2008) (holding that, because the allegations purportedly suppressed by the government were not material, "an evidentiary hearing further exploring the . . . allegations themselves and the Government's knowledge of the allegations is unnecessary"); *United States v. Spinelli*, No. 97 CR 209 (RJD), 2007 WL 3231967, at *6 (E.D.N.Y. Oct. 30, 2007) ("Because a new trial is not warranted . . . an evidentiary hearing to determine whether the government knew or should have known of [a witness's] perjury is unnecessary."). *See generally United States v. Gonzalez* 110 F.3d 936, 944 (2d Cir. 1997) ("We need not decide whether or not the evidence was suppressed, however, because we believe, in any event, that the evidence was not material."); *United States v. Gambino*, 59 F.3d 353, 366 (2d Cir. 1995) ("Finding a lack of materiality, we need not decide whether the [evidence at issue] was 'suppressed.'").

### a. July 2009 Interviews with Jackson and Joseph

Barlow was arrested on July 16, 2009. In the days immediately following Barlow's arrest, the NYPD and Brooklyn District Attorney's Office interviewed Jackson and Joseph at least twice. (Govt.'s Mem. of Law at 21-22; Margulis-Ohnuma Aff. Ex C.) There is no evidence that any witnesses, including Jackson and Joseph, provided any exculpatory information to the police or District Attorney's Office during these interviews. It appears law enforcement officials had no further interaction with Jackson or Joseph until a September 23, 2009 encounter with Joseph. *See infra*.

### b. Defense Counsel's Request for Information

On September 8, 2009, in a letter to the government, Barlow's counsel requested that the government provide "any and all exculpatory evidence or evidence that tends to impeach the testimony of any anticipated trial witness," including "[t]he identities and full contact information for any witnesses who may have materially exculpatory information" and "any witness statements" indicating either that Barlow was not involved in the robbery or that individuals other than Barlow were involved. (*See* Letter from Zachary Margulis-Ohnuma to Amir H. Toosi (Sept. 8, 2009) at 2, ECF No. 11.)

### c. The September 23, 2009 Encounter Between the AUSA, Officer Serdaros, and Joseph

Approximately two weeks later, on

September 23, 2009, the Assistant United States Attorney prosecuting the case ("the AUSA") and Officer Serdaros had an in-person encounter with Joseph on Rogers Avenue, the street where Barlow was arrested. Although the AUSA apparently alluded to this meeting on the record at trial (Tr. 281), the factual detail regarding this meeting comes from the government's opposition brief to the instant motion.

According to the government, on September 23, 2009, the AUSA, Officer Serdaros, and two agents of the Bureau of Alcohol, Tobacco, and Firearms traveled to 678 Rogers Avenue. (Govt.'s Mem. of Law at 22-23.) While the group was on the street, they were approached by Delon Joseph and, as summarized by the government, Joseph gave the following brief account of the attempted robbery on July 16, 2009:

> Joseph stated that he had been in the apartment located at 678 Rogers Avenue that day and had called 911 after leaving Jackson's apartment. At the time of the conversation, it was unclear at what point Joseph left the apartment. Joseph stated that Officer Serdaros had "gotten the guy with the gun." The undersigned asked Joseph if he saw the gun fall to the ground from "the guy's" waistband, to which Joseph replied that he had not. He also suggested that cars on the street had blocked his view. Joseph added that he saw the gun later in Officer Serdaros' hand. Officer Serdaros interjected that Joseph had run towards the location where the defendant had been arrested, pointed at the defendant, and said "That's him, that's him!" Joseph nodded when Officer Serdaros said this.

(*Id.* at 23.) The government asserts that it terminated the conversation with Joseph—which was occurring in view of pedestrians on the street—after several minutes out of a concern for Joseph's safety. (*Id.*) The AUSA took Joseph's contact information and advised him that agents would contact him to arrange a time to meet at the United States Attorney's Office. (*Id.*) According to the government, "[t]he entire conversation with Joseph lasted approximately five minutes, and at no time during the conversation was Joseph shown a picture of the defendant." (*Id.* at 23-24.) As noted above, the prosecution apparently alluded to this encounter with Joseph at trial. (Tr. 281.)

The defense argues, based upon the government's summary (which the defense accepts and does not claim is disputed by Joseph), that Joseph made two statements during the interview that ran contrary to the government's theory of the case. First, he stated that Officer Serdaros "had 'gotten the guy with the gun.'" (*Id.*) Defendant claims this was exculpatory because, under the government's theory, the "guy with the gun" was Barlow, and Sedaros had not "gotten" him because Barlow had slipped out of Serdaros's grasp and been arrested by other officers. Second, as noted above, in response to a question from the AUSA, Joseph denied that he had seen the gun fall from "'the guy's waistband." (*Id.*) Again, according to the defense, this statement is exculpatory because it contradicts Serdaros's and Aidiniou's testimony that the gun fell from Barlow's waistband while Barlow was struggling with Serdaros. However, the government contends that "at the conclusion of this brief exchange, the government believed that when Joseph referred to 'the guy,' he meant the defendant." (*Id.* at 24.) Thus, the government asserts there

was nothing exculpatory about Joseph's brief statement and the government believed, at that time, Joseph could be a government witness who would confirm that Barlow possessed the gun.

### d. The Prosecution Discloses Joseph's 911 Call

Later on September 23, 2009, as reflected in a letter to the defense, the government turned over to the defense a recording of the 911 call on July 16, 2009, which had been made by Joseph. (*See* Letter from Amir H. Toosi to Zachary Margulis-Ohnuma (Sept. 23, 2009) at 2, ECF No. 15.) On the call, Joseph provided his contact information. Additionally, the government stated in the letter that it was not in possession of any *Brady* material. (*See id.*) The government's letter was filed on the ECF system at 10:53 p.m. Thus, it appears that the letter was filed after the encounter with Joseph on the street.

### e. The Government's Attempts to Contact Joseph and the Government's 404(b) Motion

The government asserts it subsequently made repeated attempts to arrange an additional, more private meeting with Joseph but that Joseph refused to cooperate. Specifically, the government claims that Joseph failed to respond to a voicemail message left by an ATF agent and hung up when contacted by the AUSA. (Govt.'s Mem. of Law at 24.) Additionally, when an ATF agent was sent to Joseph's apartment, Joseph told the agent that he had to run an errand and would be back in 20 minutes. (*Id.*) Although the agent waited at the apartment for over an hour, Joseph failed to return. (*Id.*) The government claims that, after this incident, it temporarily discontinued its efforts to contact Joseph. (*Id.*)

On September 30, 2009, in connection with a motion to admit evidence under Federal Rule of Evidence 404(b), the government stated that it "may call a witness at trial that was inside the apartment during the attempted robbery and witnessed the defendant's arrest." (Letter from Amir H. Toosi to Hon. Joseph F. Bianco (Sept. 30, 2009) at 3 n.3, ECF. No. 18.) According to the government (and the defense does not dispute), it subsequently told defense counsel that this witness was the "911 caller," i.e., Joseph. (Govt.'s Mem. of Law at 25.)

### f. The Defense's Investigatory Efforts

The defense also made attempts to contact civilian witnesses. Defense counsel states that he was told by the government that Barlow possessed the gun for use in a burglary or robbery of a second-floor apartment at 678 Rogers Avenue; the apartment was a drug location; and civilian witnesses had refused to cooperate with the government, in part because they were scared of Barlow. (Margulis-Ohnuma Aff. ¶ 6.) Nonetheless, the defense team "canvassed the crime scene and surrounding area" and rang the bell for Jackson's apartment at 678 Rogers Avenue. (*Id.* ¶ 8.) A person answered but refused to cooperate. (*Id.*) According to defense counsel, based on the person's refusal and on the government's assertions that the apartment was a drug location, he "did not pursue the matter further." (*Id.*)[5]

---

[5] The AUSA subsequently told the defense that the apartment was not, in fact, a drug location. (Margulis-Ohnuma Aff. ¶ 7.)

### g. The Defense Renews Its Requests for *Brady* Material

On October 9, 2009, in a letter to the government, Barlow's counsel made a renewed request for *Brady* material and specifically requested any material relating to the motive for the alleged attempted break-in at 678 Rogers Avenue. (*See* Letter from Zachary Margulis-Ohnuma to Amir H. Toosi (Oct. 9, 2009) at 1-2, ECF No. 26.) On that same day, the government, responded in writing and stated that "the government is not in possession of any evidence that the defendant did not participate in a conspiracy to commit robbery at 678 Rogers Avenue on July 16, 2009." (Letter from Amir H. Toosi to Zachary Margulis-Ohnuma (Oct. 9, 2009) at 1, ECF No. 31.) Also on October 9, defense counsel asked the government to provide contact information for the "911 caller," i.e., Joseph. (Margulis-Ohnuma Aff. ¶ 11.) As noted above, the government had previously provided defense counsel with the 911 tape on which the caller gave his contact information. However, Joseph had apparently had this number disconnected by the time defense counsel tried to call. (*Id.*) The AUSA responded to defense counsel's request via e-mail and stated that the government would subpoena the 911 caller, "but so far he's been difficult to get in touch with." (Margulis-Ohnuma Aff. Ex. D.) The government also implied that it would provide defense counsel with contact information for the 911 caller but needed to talk first with defense counsel about "ground rules for dissemination to your client." (*Id.*)

On October 12, 2009, the day before trial was to begin, defense counsel made an additional request in a letter to the government for *Brady* material and any prior statements of witnesses concerning the other individuals who were arrested near 678 Rogers Avenue on July 16, 2009. (*See* Letter from Zachary Margulis-Ohnuma to Amir H. Toosi (Oct. 12, 2009) at 1-2, ECF No. 32.) Also in this letter, defense counsel confirmed "that the government is attempting to subpoena the 911 caller we discussed, and that if the government succeeds and does not call that individual as witness, the government will arrange for the defense to do so." (*Id*. at 2.) The government also apparently agreed to subpoena the additional civilian witnesses—Jermaine Jackson and Gregory Parker. (*See* Gov't.'s Mem. of Law at 27-28.)

### h. Jackson and Parker Appear at Trial

On the second day of trial, October 14, 2009, Jackson and Parker appeared in court in response to the government's subpoenas. Joseph did not appear. During a break from trial, members of both the prosecution team and the defense team spoke to Jackson and Parker. Neither side could determine, based on these brief conversations, whether Jackson or Parker would be able to offer helpful testimony. (*See* Margulis-Ohnuma Aff. ¶ 17; Gov't.'s Mem. of Law at 28.) That night, the defense team had a more lengthy conversation with Jackson. During this conversation, Jackson told the defense team that he had seen the police take the gun from someone other than Barlow. (Margulis-Ohnuma Aff. ¶ 18.)

### i. The October 15 Sidebar

The following day at trial, the AUSA represented during a sidebar that he believed that Joseph had identified Barlow as the person who had the gun. Defense counsel cites this statement as yet another step by the prosecution to dissuade the defense from contacting Joseph. (*See* Def.'s Reply Mem. of Law at 12-13.)

By way of background, defense counsel had attempted to ask Officer Serdaros whether, on July 16, 2009, Jermaine Jackson pointed to Barlow and said that Barlow was not involved. The AUSA objected before defense counsel could finish the question, and the Court held a sidebar. During the sidebar, the AUSA represented that he had spoken to Delon Joseph and that he was under the impression that Joseph had identified Barlow as a perpetrator on July 16, 2009.[6] Ultimately, the Court sustained the government's objection because any testimony by Sedaros about what Jackson said would be hearsay and because, even if not offered for the truth of matter, could not be used to impeach Serdaros because there was no indication that Serdaros had ever stated that Jackson identified Barlow. (*See* Tr. 277-83.)[7]

### j. The Government Establishes Contact with Joseph; Joseph Testifies as a Defense Witness

Although Jackson and Parker had appeared at trial in response to the government's subpoena, Delon Joseph had not. According to the government, it then decided "to make one

---

[6] The AUSA stated "I don't think [Jermaine Jackson] is the one who ran up and pointed at the defendant and said that's him, that's him. That would be De[l]on Joseph. In fact, I had a conversation with Mr. Joseph several weeks ago now, which he confirmed that." (Tr. 281.)

[7] In his affirmation, defense counsel stated that he withdrew his question "[b]ased on the government's representation [at the sidebar] that both Officer Serdaros and Delon Joseph would testify that Joseph identified Barlow at the scene . . .." (*See* Margulis-Ohnuma Aff. ¶ 21.) The record as a whole, however, belies this assertion. The Court would not have allowed defense counsel to ask the question for the reasons set out above. (*See* Tr. 277-83.)

last effort" to interview Joseph, believing that he would testify favorably to the government and could rebut Jackson's testimony. (Govt.'s Mem. of Law at 29.) An ATF agent located Joseph, and the AUSA spoke with Joseph on Friday, October 16, 2009. During the interview, the AUSA determined that Joseph believed that the firearm had been recovered from someone other than Barlow. (*Id.* at 29-30.) The government states that this was the first it had learned that Joseph believed the gun had been recovered from someone else and that it contacted defense counsel within an hour of learning this information. (*Id.* at 30.) The AUSA also told defense counsel that he had been mistaken in asserting that Joseph was uncooperative due to his fear of Barlow. (Margulis-Ohnuma Aff. ¶ 24.) The following Monday, Joseph testified as a defense witness.

### 2. The Parties' Arguments

As will be discussed in more detail below, there are three requirements for a *Brady* violation. These are (1) that evidence favorable to the accused was (2) suppressed—either willfully or inadvertently—by the prosecution and (3) that prejudice ensued. *See United States v. Douglas*, 525 F.3d 225, 244-45 (2d Cir. 2008); *accord Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

### a. Barlow

Here, the focus of Barlow's *Brady* claim relates to defense witnesses Jackson and Joseph.

First, he asserts that the government knew well before trial that Jackson and Joseph both believed that Barlow did not possess the gun. Specifically, defendant speculates that the NYPD and Brooklyn DA's Office must have

learned during the July 2009 interviews with Jackson and Joseph that neither witness believed that Barlow possessed a gun. The record, however, contains absolutely no evidence to support this assertion. Defendant also argues that members of the prosecution team knew, based on the September 23, 2009 encounter with Joseph (as described by the government), that Joseph believed that Barlow did not possess the gun. Specifically, defendant cites Joseph's statement that Officer Serdaros had "got[ten] the guy with the gun'" as exculpatory because Serdaros did not arrest Barlow. Defendant also points out that, in response to a question from the AUSA, Joseph denied that he had seen the gun fall from "the guy's waistband." Again, according to the defense, this statement is exculpatory because it contradicts Serdaros's and Aidiniou's testimony that the gun fell from Barlow's waistband while Barlow was struggling with Serdaros.

Furthermore, with respect to Jackson and Joseph, defendant claims that the prosecution engaged in a series of actions intended to hamper the defense's access to these witnesses. As evidence of this, defendant claims that the government refused to provide contact information; falsely stated that the apartment was a drug location; attempted to intimidate Joseph during the September 23 encounter; and falsely stated on the record at trial that Joseph believed Barlow was one of the perpetrators of the alleged burglary or robbery. (*See* Def.'s Reply Mem. of Law at 12-13.)

Although both Jackson and Joseph testified at trial for the defense, Barlow alleges that he was nonetheless prejudiced. Specifically, he claims that knowing about Jackson and Joseph's likely testimony before trial would have enabled his counsel to give a more effective opening statement and to conduct

more searching cross-examinations of Officer Serdaros and Sergeant Aidiniou. ( Def's Mem. of Law at 26-32; Def.'s Reply at 7.) Additionally, defendant claims that Jackson's and Joseph's version of events was "rich with leads, opening up new avenues of inquiry and investigation into Mattocks and his cohorts" (Def.'s Mem. of Law at 29) but that he was unable to pursue these avenues because he did not know about them until the middle of trial.

b. The Government

In response, the government contends that it did not suppress any exculpatory information. As a threshold matter, the government asserts that it was unaware of Jackson's and Joseph's potentially exculpatory testimony until trial. As to the July 2009 interviews with the Brooklyn DA, the government states, in its opposition, that it spoke to the individuals in the Brooklyn DA's Office who interviewed Jackson and Joseph and that any substantive conversations "were almost exclusively limited to what had occurred before officers had arrived" and "did not include the subject of the firearm . . . ." (Govt.'s Mem. of Law at 20-21.) As to the September 23, 2009 encounter with Joseph, the government asserts that it believed, albeit incorrectly, that Barlow was "the guy" referenced in Joseph's statement that Serdaros "got the guy with the gun." The government argues that this good-faith but mistaken belief was the basis for the statements in its Rule 404(b) motion implying that any testimony from Joseph would be favorable to the prosecution. (*See* Govt.'s Mem. of Law at 24-25.)

Additionally, the government takes issue with defendant's argument that it hindered access to Jackson and Joseph. In support of its position, the government points out that a

15

number of documents turned over to the defense listed Jackson and Joseph as witnesses and provided contact information for them. Specifically, it notes several uncontroverted facts: that Jackson's home address was in the criminal complaint filed by the Brooklyn DA's office; that it gave defense counsel Joseph's telephone number a week before the number was disconnected; and that it disclosed material under 18 U.S.C. § 3500 listing Jackson as a resident of 678 Rogers Avenue and Joseph as a neighbor. Furthermore, the government argues that it subpoenaed the witnesses for defense counsel; and that, once it learned during the trial that Joseph possessed exculpatory information, it immediately contacted defense counsel. (Govt.'s Mem. of Law at 35.)

3. Analysis

As noted above, cases subsequent to *Brady* have elucidated three requirements for "'a true *Brady* violation'": first, "'[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching'"; second the "'evidence must have been suppressed by the [prosecution], either willfully or inadvertently'" and third, "'prejudice must have ensued.'" *United States v. Douglas*, 525 F.3d 225, 244-45 (2d Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999))). The third requirement is also sometimes labeled the "materiality" requirement and asks whether, had the information been disclosed, there was a "reasonable probability of a different result." *See Strickler*, 527 U.S. at 289-90; *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003).

There is no question that the information possessed by Jackson and Joseph (as reflected in their trial testimony for the defense) meets the first requirement—namely, that the information was favorable to Barlow. Thus, the issue is whether defendant has met the other two requirements to prevail on a *Brady* claim, by showing that the government suppressed the evidence and that the suppression resulted in prejudice to the defendant. As discussed below, the Court concludes that neither of these requirements are met under the circumstances of this case.

a. The "Suppression" Requirement

Although the testimony of Jackson and Joseph was favorable to the defendant, Barlow has failed to demonstrate that the government suppressed this exculpatory information from the defense. Barlow, despite having interviewed these witnesses and put them on the stand at trial, has not provided any testimony or claim by these witnesses that they provided exculpatory information to law enforcement prior to trial during any interaction or interview. Moreover, there is no document containing exculpatory information provided by these witnesses or any other witnesses. In addition, in the summary of the government's interactions with these witnesses prior to trial (provided in opposition to the motion), there is no evidence that exculpatory evidence was provided. Instead, defendant speculates that, because the defense witnesses ultimately testified in an exculpatory manner at trial and there were interactions with these witnesses by the government prior to trial, the exculpatory information must have been provided prior to trial. However, there is no evidence to support that assertion. In fact, the government's actions both prior to trial and during the trial do not reflect an effort to suppress these witnesses, but rather reflect a consistent effort to locate these witnesses and subpoena them because the government believed they were potential government

witnesses.[8]  For example, their attendance at trial resulted from the actions of the government.  Jackson appeared because of a government subpoena, and Joseph appeared as a result of a government attempt to contact him after he failed to respond to a subpoena.[9]  *Cf. Hoover v. Leonardo*, No. 91-CV-1211 (JG), (E.D.N.Y. June 11, 1996), 1996 WL 1088204, at *3 (finding no *Brady* violation where prosecution, at the request of defense, searched for witness with "reasonable diligence").  The lack of any suppression of exculpatory information by the government is further indicated by the fact that it is undisputed that the government, after interviewing Joseph during the trial, immediately conveyed the exculpatory information from the interview to

the defense.

In short, there is a complete absence in the record of any evidence that the government, although it disclosed exculpatory information during the trial, possessed this information at some point prior to trial.  However, any purported factual disputes regarding whether the government possessed this information prior to trial need not be resolved for purposes of this motion because the suppression requirement also is not met if the disclosure is eventually made, even during trial, and was effectively used by the defense during the trial.  As the Second Circuit has explained, "[w]ith respect to *when* the prosecution must make a disclosure required by *Brady*, the law also appears to be settled.  *Brady* material must be disclosed in time for its effective use at trial."  *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (emphasis in original).  Therefore, "*Brady* material that is not 'disclos[ed]' in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the *Brady* doctrine."  *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (quoting *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001)).  On other hand, if the defense receives the information from the government in time for its effective use at trial by the defense, then the information has not been "suppressed" within the meaning of *Brady* regardless of whether the disclosure was made immediately before trial or even during the trial.  *Id.* at 245-46 (finding government's disclosure of documents one business day before trial did not constitute "suppression" within the meaning of *Brady* because defense counsel had sufficient time to make effective use of documents).

With respect to the issue of "effective use," the Second Circuit has emphasized that there

---

[8] For example, as the government was preparing to rest its case on October 15, it was still hoping to locate Joseph and call him as a rebuttal witness. (*See* Tr. 492 ("[AUSA]: I will say that if I can find Mr. Joseph, I would like to call him.  If I can't, then obviously I won't be able to.").)

[9] To the extent the defendant argues that the government attempted to hinder defense counsel's ability to contact these witnesses, there is no support for that claim.  First, it is clear from defense counsel's affirmation (and the events at trial) that he knew from documents provided by the government prior to trial, as well as from pre-trial discussions with the government, that these civilian witnesses existed.  Moreover, it is uncontroverted that defense counsel could have gleaned contact information for Jackson and Joseph from the documents.  In fact, defense counsel acknowledges in his affirmation that he "canvassed" the neighborhood and visited 678 Rogers Avenue, but an occupant of Jackson's apartment refused to cooperate.  Thus, by locating these witnesses and serving subpoenas on them, as well as by providing the contact information to the defense, the government was clearly facilitating (rather than hindering) the appearance of these individuals as witnesses at trial.

are situations where the receipt of exculpatory information immediately prior to trial, or during the trial, will not provide the defense with sufficient time to fully and effectively develop and use the information. For example, in *Leka v. Portuondo*, the Second Circuit explained:

> The limited *Brady* material disclosed to [the defendant] could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case. *See United States v. Cobb*, 271 F. Supp. 159, 163 (S.D.N.Y. 1967) (Mansfield, J.) ("[T]here may be instances where disclosure of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled and presented.").

257 F.3d at 101; *accord Watson v. Greene*, No. 06 CV 2212 (CBA), 2009 WL 5172874, at *31 (E.D.N.Y. Dec. 30, 2009) ("Although pretrial disclosure is not mandated in all circumstances . . . , favorable evidence that has a material bearing on defense preparation must be disclosed prior to trial if further development by defense counsel would be necessary in order to put it to effective use." (internal quotation and citations omitted)). Thus, the late disclosure of exculpatory evidence is fraught with great danger of prejudice to the defendant,

and a court must carefully scrutinize any such situation to ensure that, despite the fact that information was disclosed on the eve of trial or during the trial, the defense was able to effectively use the information.

In the instant case, as discussed in detail *infra* in connection with the "prejudice" or "materiality" requirement, there is absolutely no question that the information was fully and effectively used by the defense at trial and, thus, the "suppression" requirement has not been met. In particular, the Court, having presided over the trial and having observed how the trial developed and how the exculpatory information was utilized, concludes the "effective use" requirement has been met under the circumstances present here for a number of reasons, including: (1) the exculpatory information required no development or investigation (unlike the situation in *Leka*) because its exculpatory nature was apparent and the witnesses were immediately available to testify pursuant to the government subpoena; (2) the two exculpatory witnesses testified at trial and all of the exculpatory information in their possession was placed before the jury; (3) the exculpatory information was completely consistent with the defense theory of the case to that point—namely, that the gun was seized from someone other than the defendant—and defense counsel was not required to shift or alter his theory of the case in any manner whatsoever (and no mistrial on that basis, or any other basis, was sought); (4) there is absolutely no evidence that these witnesses opened the door to other potential exculpatory leads, such as witnesses or documents, which needed to be investigated and presented; (5) the lack of any need for additional investigation is reflected in the fact that, upon receiving the exculpatory information, defense counsel never moved for an adjournment of

the trial to conduct a further investigation, nor have defendant's detailed, post-trial submissions indicated any other investigation that would have led to the uncovering of additional exculpatory evidence. Based upon these facts, which were immediately apparent from presiding over the trial, the Court concludes that the defense had full and effective use of the exculpatory information at the trial, and, thus, no "suppression" occurred within the meaning of *Brady* because of any purported late disclosure of the information.

### b. The "Prejudice" Requirement

As set forth below, the Court also concludes that the "prejudice" requirement—which is also referred to as the "materiality" requirement—has not been met.

The focus of the prejudice or materiality requirement is whether, with the full use of the exculpatory information at trial, there was "a reasonable probability of a different result." *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (internal citations and quotations omitted). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Disimone v. Phillips*, 461 F.3d 181, 196 (2d Cir. 2006) (quoting *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)). "'[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Here, there is no probability of a different result if, before trial, the government had disclosed that Jackson and/or Joseph possessed exculpatory information. First and foremost, as noted above, both witnesses testified for the defense at trial and all of the exculpatory information from these two witnesses was presented in its entirety to the jury. Second, although defendant became aware during trial that Jackson and Joseph could offer helpful testimony, this revelation did not result in any appreciable shift in the defense's strategy. Defense counsel's strategy from the outset—which was the only sensible strategy under the circumstances—was to argue that the gun came from someone other than Barlow. For example, in his opening statement, defense counsel argued that

- "[n]obody saw Mr. Barlow touching a gun. No fingerprints were found on a gun. No fingerprints were found on a bullet. No fingerprints were found on a cartridge. There is nothing connecting Mr. Barlow to the robbery you just heard about . . . .";[10]

- "You're going to find reasonable doubt as to whether anyone actually saw Mr. Barlow pick up, sorry, drop or possess at any time that gun";[11]

- "[Barlow] was not in a position to possess a gun, let alone commit a robbery";[12]

- "[Officer Serdaros] grabbed Mr. Barlow out of the blue,

---

[10] (Tr. 13.)

[11] (Tr. 14.)

[12] (Tr. 15.)

with no good reason, and when a gun turned up nearby, he had no choice essentially but to pin it on Mr. Barlow";[13]

• "[T]here's no connection indicating some kind of coordinated activity [between Barlow and other people arrested]. Sure, one of them had a gun, but it couldn't have been, because of the physical evidence, Mr. Barlow."[14]

The testimony of Jackson and Joseph did not alter this strategy. Nor—despite defense counsel's conclusory insistence to the contrary in the Rule 33 motion—did the witnesses' testimony open up "new leads" requiring additional investigation. The only contested issue in this case was a straightforward one—whether the gun came from Barlow or someone else. The testimony of Jackson and Joseph simply countered the testimony of Officer Serdaros and Sergeant Aidiniou as to who had the gun; it did not expose additional theories of liability or exculpation. *See Douglas*, 525 F.3d at 246 (rejecting defendant's argument that disclosure of documents before trial occurred too late "'to follow up on any leads'" from the documents because defendant "provides no hint as to what sort of leads could have been gleaned" from the documents "and none come to mind"); *cf. Disimone*, 461 F.3d at 197 (stating that *Brady* requirements met when information near the close of prosecution's case "would likely have altered the defense's cross examination of [a key witness] and it could even have completely changed the nature of the defense strategy").[15]

Furthermore, Barlow's counsel was also able to make extensive use of Jackson's and Joseph's testimony in his summation. *See United States v. Diaz*, 922 F.2d 998, 1007 (2d

---

[15] Moreover, to the extent defense counsel is arguing that Jackson's and Joseph's testimony made it likely that there were other eyewitnesses supporting the defense theory of the case, that argument is without merit. Defense counsel's previous "canvassing" of the neighborhood had proven fruitless, and defense counsel provides no reason to believe that the result would have been different if he had re-canvassed the area after Jackson and Joseph had testified. Additionally, even if the testimony did result in a need for further investigation, defense counsel did not seek an adjournment to conduct any such investigation. *United States v. Douglas*, 415 F. Supp. 2d 329, 340-41 (S.D.N.Y. 2006) ("[T]he Court of Appeals has never held . . . that seeking an adjournment (the classic remedy for belated disclosure of exculpatory information), is not required when doing so could adequately remedy a late disclosure." (internal citation omitted))), *aff'd*, 525 F.3d 225 (2d Cir. 2008). More specifically, Jackson testified on October 15, 2009, and Joseph's exculpatory information was disclosed on Friday, October 16, 2009. Joseph did not testify until the following Monday, October 19, 2009. Thus, defendant has not explained why any additional investigation could not have been done during those days and, if that time was not sufficient, why no adjournment of the trial (or other remedy) was requested. In fact, after receiving the disclosure, defense counsel simply advised the Court that he would be calling Joseph and did not complain about any prejudice resulting from the timing of the disclosure, nor did counsel request an adjournment. (*See* Tr. 526.) Finally, defendant has not pointed to information he discovered post-trial that he was unable to discover and present to the jury during the trial due to a lack of time to investigate.

---

[13] (Tr. 16.)

[14] (Tr. 17-18.)

Cir. 1990) (finding no *Brady* violation where defense counsel "plainly had [a certain witness's] testimony available for use in summation" and did not seek to recall another witness who had earlier offered conflicting testimony).

Additionally, to the extent defendant argues that the belated disclosures regarding Jackson and Joseph inhibited his cross examination of Officer Serdaros and Sergeant Aidiniou, the Court disagrees. There was nothing about the defense witnesses' testimony that would have provided additional lines of cross-examination of the police officers and, even if it did, there is nothing that prevented defense counsel from recalling these witnesses following Jackson's and Joseph's testimony. *See United States v. Mora*, Nos. 96-1566, 96-1569, 96-1567, 96-1815, 96-1568, 1998 WL 398802, at *2 (2d Cir. June 8, 1998) ("The fact that defendants failed to make use of much of the evidence in question once it was disclosed by the government—by, among other things, failing to recall government witnesses whose cross-examination by defendants was allegedly hampered by the belated disclosures—only reinforces our conclusion that new trials are not warranted, and belies defendants' claims regarding the importance of this evidence."); *United States v. Curry*, No. 94-3600, 1995 WL 331471, at *1-2 (6th Cir. June 2, 1995) (finding no *Brady* violation, despite delayed disclosure regarding existence of individual whose testimony contradicted key government witness, where individual actually testified and rebutted government witness's testimony and where defense failed to recall key government witness for cross examination).

In sum, Barlow has not established that his due process rights were violated because the prosecution failed to disclose, or belatedly disclosed, exculpatory information.[16] Therefore, his *Brady* claim fails.

---

[16] Barlow also raises a slightly different *Brady* claim with respect to Officer Serdaros. He asserts, with no support in the record, that Serdaros's presence at the September 23 encounter (along with the AUSA and two ATF agents) with Joseph suggests the possible use of unprofessional investigative techniques and an attempt by Serdaros to intimidate Joseph. He argues that, by failing to disclose the fact that Officer Serdaros was present during the encounter with Joseph, the government failed to disclose exculpatory information. (*See* Def.'s Reply Mem. of Law at 6-8.) This argument is completely without merit. As an initial matter, it is unclear how these assertions regarding Serdaros's motives during the encounter are in any way exculpatory of Barlow. Nor is it clear how Serdaros's presence at that meeting could be used to impeach Serdaros's perception of the events of July 16, 2009, which were the focus of his trial testimony. Finally, to the extent defendant believes it could have been used as impeachment material to undermine Serdaros's credibility, any prejudice to defendant from the non-disclosure of Serdaros's presence at this five-minute encounter is non-existent. Despite any supposed attempts to intimidate Joseph, Joseph ultimately appeared as a defense witness. Moreover, the prosecution notified the defense that Joseph was a defense witness on Friday, October 16, 2009, and Joseph did not testify until three days later—Monday, October 19, 2009. Thus, defense counsel had ample opportunity, in preparing Joseph, to learn whether he had interacted with the police and whether he felt pressured at any point by the police. In fact, there was no claim by Joseph during his trial testimony (or at any other time) that he had been intimidated or pressured in any way by the police. In short, there is absolutely no evidence of intimidation or pressure exerted at the September 23 encounter, and any failure to disclose the presence of Serdaros at that meeting does not constitute a *Brady* violation that would warrant a new trial.

## C. Fair Cross-Section Claim

Finally, Barlow argues that his Sixth Amendment rights were violated because, he alleges, the jury in his trial was not drawn from a fair cross section of the community. Specifically, Barlow points out that the 60-person jury venire for his trial contained no African-American men.[17] Barlow contends that this occurred because African-American men were disproportionately affected by certain policies of the Eastern District of New York jury clerk.[18] In particular, Barlow asserts that

---

[17] According to data provided by the Clerk of the Court, and not controverted by defendant, there were 11 African-American women in the venire. *See* ECF No. 80-1 at 31. Two African-American women were ultimately seated on the jury.

[18] In addition to his Sixth Amendment claim, defendant also apparently brings a claim under the Jury Selection and Service Act (JSSA), 28 U.S.C. § 1861, *et seq.* (*See* Def's Mem. of Law at 33-34.) Defendant, however, has not complied with the procedural requirements for bringing a statutory claim. To bring a statutory claim, a defendant must move to dismiss the indictment or stay the proceedings either before voir dire or within seven days after he could have discovered the grounds for a violation of the JSSA. 28 U.S.C. § 1867(a). The motion must "contain[ ] a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of [the JSSA]." *Id.* § 1867(d); *accord United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987). Here, although defendant objected to the absence of any African-American males during the voir dire, he did not move to dismiss the indictment. Furthermore, even if his objection could somehow be construed as a motion to dismiss the indictment, he did not file a sworn statement of facts at that time. Accordingly, his statutory claim is "neither timely nor in compliance with the requisite procedures set forth in the statute." *Young*, 822 F.2d at 1239. In any event, statutory fair cross-section claims are

"[t]his discrepancy is due in part to the fact that the jury clerk erroneously disqualified black males who answered 'yes' to questions about their contact with the criminal justice system." (Def.'s Mem. of Law at 33-34.) Thus, according to Barlow, "[t]he clerk's erroneous handling of these prospective jurors—with its vastly disproportionate effect on black males—amounted to systematic exclusion of black males and therefore a new trial is required under the Sixth Amendment and the JSSA." (*Id.* at 34.) As set forth below, the Court concludes that this claim has no merit.

As a threshold matter, although Barlow seeks an evidentiary hearing with respect to his fair cross-section claim, the Court concludes that a hearing is unwarranted under the circumstances of this case. As reflected in the thorough submissions of defense counsel, Barlow's counsel was given unfettered access by the Clerk of the Court to information regarding all aspects of the jury-formation process in this District, including the formation of the master jury pool, the qualified wheel, and the venires and has had a full opportunity to investigate and develop his fair cross-section claim. Barlow's counsel was also given all statistical information from the Clerk of the Court to determine the breakdown of African-American males in the master jury pool, the qualified wheel, and the venires, as well as access to the underlying juror questionnaires that counsel wished to inspect. As a result of that unfettered access,

---

analyzed in the same way as constitutional claims. *See id.*; *see also United States v. Barnes*, 520 F. Supp. 2d 510, 513-14 (S.D.N.Y. 2007). Therefore, even if defendant had followed the procedures for bringing a statutory claim, the claim would fail for the reasons set forth *infra*.

there are no disputed factual issues regarding the process or the statistical evidence; rather, Barlow appears to seek a hearing, *inter alia*, to have the Jury Department explain why it determined that certain jurors were disqualified based upon their responses to the questionnaires. However, the Court finds that such a hearing is unnecessary for two principal reasons. First, the reasons for the disqualifications of most of the prospective jurors at issue is apparent from the face of the questionnaire and no further inquiry is necessary; as to those where it is not apparent, the government has conceded (or is willing to assume) that the individuals were erroneously disqualified by the Jury Department due to administrative error. Thus, a hearing is unnecessary to address the individual questionnaires. Second, and more importantly, there is no reason to explore this issue, or any other related issue, at an evidentiary hearing because, regardless of any resolution of the defendant's complaints about the overall process and the handling of individual questionnaires, he cannot satisfy the "unfair underrepresentation" requirement under *Duren* given the undisputed statistical evidence in this case. In other words, as will be set forth in greater detail below, the parties do not dispute percentages of African-American males in the relevant jury pools, and there is no substantial underrepresentation as a matter of law based upon any of those figures. No set of facts developed at an evidentiary hearing could alter that legal defect. Therefore, there is no need to resolve any purported factual disputes on other issues, and an evidentiary hearing on any such factual disputes is unwarranted. *See, e.g.*, *United States v. Terry*, 60 F.3d 1541, 1544 n.2 (11th Cir. 1995) ("Because no set of facts that could have been developed in an evidentiary hearing would be significant legally in the light of the precedents mentioned above, we believe the district court did not abuse its discretion [in

denying an evidentiary hearing on the fair cross-section claim]"); *United States v. Miller*, 771 F.2d 1219, 1228-29 (9th Cir. 1985) ("Because appellants' motion and supporting affidavit failed to establish that underrepresentation occurred generally or in venires other than their own, the district court did not err in denying them an evidentiary hearing on their challenge to the composition of the grand jury."); *United States v. Stone*, No. CRIM.A. 93-00131, 1993 WL 246047, at *5 (E.D. Pa. June 30, 1993) (rejecting fair cross-section claim without an evidentiary hearing because "[d]efendants' failure to demonstrate any statistical underrepresentation of African-Americans whatsoever on the qualified jury wheel for the Eastern District of Pennsylvania compels me to deny their constitutional challenge"). Similarly, defendant's request for additional discovery—namely, any communications between the Clerk of the Court and the U.S. Attorney's Office regarding defendant's motion—is denied because it is immaterial to the Court's resolution of the motion.

1. Overview of the Jury Formation Process[19]

The process of forming a jury venire in this District is governed by the Jury Selection and Service Act, 18 U.S.C. § 1861, *et seq.* and by the Jury Selection Plan for the Eastern District of New York ("the Jury Plan"). *See* United States District Court, Eastern District of New York, Jury Selection Plan, *available at* http://www.nyed.uscourts.gov/pub/docs/jury plan.pdf (last visited July 30, 2010).

---

[19] The Court will refer to the process by which venires are formed as the "jury formation process" or "juror qualification process" to distinguish it from the process more commonly known as "jury selection" or "voir dire."

### a. Formation of the Master Jury Wheel

The initial step in the process is the formation of a master jury wheel. The master jury wheel is formed by randomly selecting names of residents of the Eastern District of New York from voter registration lists and Department of Motor Vehicles records. A master jury wheel is formed "on or before September 1 following each presidential election and every two years thereafter." Jury Plan § 5.

Here, 2009 was a year "following [a] presidential election." Thus, the Eastern District of New York was required to form a new master jury wheel by September 1, 2009. (*See* Letter from Robert C. Heinemann, Clerk of the Court, to Joseph F. Bianco, United States District Judge (Jan. 19, 2010) ("Heinemann Jan. 19 Letter"), ECF No. 71.) Accordingly, in the spring of 2009, the Jury Department randomly drew over 500,000 names from voter registration records and Department of Motor Vehicles lists in all five counties that make up this District. These names made up the relevant master jury wheel. (*See id.*; *see also* Margulis-Ohnuma Aff. ¶ 35.)

### b. Formation of the Qualified Jury Wheel

Following the formation of the master jury wheel, the next step is the formation of a qualified jury wheel from the master jury wheel.

Periodically, at the direction of the Chief Judge, the Clerk of the Court randomly draws names from the master jury wheel and mails juror qualification forms to the people selected. Here, that process occurred during July and August 2009. The Jury Department randomly drew names from the master jury wheel and mailed out over 77,000 questionnaires.

(Heinemann Jan. 19 Letter; Margulis-Ohnuma Aff. ¶ 36.)

The questionnaire instructs recipients to fill it out and return it within ten days. Jury Plan § 6. Among other things, the questionnaire asks questions to determine whether a potential juror should be disqualified, excused, or exempted from jury service. The different categories of disqualification, exemption, or excuse are described below.

Both the Jury Act and the Jury Plan require that the following categories of people be disqualified from serving as jurors:

(1) those under age 18;

(2) those who have not resided in the District for one year;

(3) those who are unable to read or write English well enough to fill out the juror qualification form;

(4) those who are unable to speak English;

(5) those who have a mental or physical infirmity preventing them from serving;

(6) those who have either a felony charge pending against them or have been convicted of a felony and have not had their civil rights restored.

*See* 28 U.S.C. § 1865(b); Jury Plan § 9. Additionally, the Jury Plan provides that some categories of individuals may be excused upon

individual request.[20]  Finally, under the Jury Plan, certain categories of people—including active-duty military members; active, full-time paid members of a police or fire department; and elected and some appointed public officials—are considered "exempt" from jury service.  Jury Plan § 8.

The front of the juror questionnaire form asks questions to determine whether a potential juror falls into one of the categories for disqualification, exemption, or excuse.  The back of the form provides a space for potential jurors to elaborate on any claimed disqualification, exemption, or excuse.  In some instances, the form instructs the juror to provide amplifying information.  For example,

─────────────────────────

[20] These are:

(1) people over age 70;

(2) active members of the clergy;

(3) persons having active care and custody of a child or children under 10 years of age whose health and/or safety would be jeopardized by their absence for jury service; or a person who is essential to the care of aged or infirm persons.

(4) actively practicing attorneys, physicians, dentists, and registered nurses;

(5) people who have served on a grand or petit jury within the preceding two years; and

(6) people whose services are so essential to their business that the business would have to close if the person had to serve on jury duty.

Jury Plan § 7.

a prospective juror who claims to be disqualified because of a felony conviction or pending felony charge is instructed to list on the form the date of the offense, the date of conviction or pending charge, the nature of the offense, the sentence imposed, and the name of the court.

Once questionnaires are returned, "[t]he Chief Judge, on his initiative or upon recommendation of the clerk, shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is qualified for, or exempt, or to be excused from jury service."  Jury Plan § 9.

As a practical matter, personnel in the Jury Department manually screen each returned questionnaire to determine whether or not a particular individual should be disqualified, excused, or exempt.  (*See* Margulis-Ohnuma Aff. ¶ 36.)  Those who are not disqualified, excused, or exempted are considered qualified and placed in the "qualified wheel."

Here, by early September 2009, approximately 23,000 questionnaires had been returned and screened by the Jury Department.  (*See* Margulis-Ohnuma Aff. ¶ 54.)[21]  More than half of these people were disqualified, excluded, or exempted, and 10,187 people were in the qualified juror wheel as of September 11, 2009.  (Letter from Zachary Margulis-Ohnuma to Hon. Joseph F. Bianco (Apr. 23, 2010), at 3-4 ("Margulis-Ohnuma Apr. 23 Letter"), ECF No. 83.)  The Jury Department apparently continued screening questionnaires as they were returned, and, by November 17, 2009, the qualified wheel

─────────────────────────

[21] The Court will refer to this subset of the master jury wheel as the "master jury pool."

consisted of 12,500 jurors. (*See* Letter from Robert C. Heinemann, Clerk of the Court, to Joseph F. Bianco, United States District Judge (Apr. 5, 2010) ("Heinemann Apr. 5 Letter"), ECF No. 77-1 .)

### c. Formation of Jury Panels

Grand and petit jury panels are then formed as necessary from the qualified wheel. Jury Plan §§ 13-14. When a need arises for grand or petit jurors, names are selected at random from the qualified jury wheel, and summonses are mailed to the people selected. No distinction is made between civil or criminal cases or between juries required for the Brooklyn courthouse or the Long Island courthouse. *See id.*

Here, on September 11, 2009, the Jury Department selected 750 names from the qualified wheel and summoned those people to report for jury service at the Brooklyn courthouse on October 13, 2009, the day jury selection began in this case. (*See* Heinemann Jan. 19 Letter at 2; Margulis-Ohnuma Aff. ¶ 41.)

### d. Formation of Venires

Once potential jurors arrive at the courthouse, they proceed to the central jury room. There, potential jurors are selected at random for assignment to a venire. Thus, here, on October 13, 2009, 60 people were drawn at random from the central jury room, and it was these people who made up the venire for Barlow's trial. (*See* Letter from Robert C. Heinemann, Clerk of the Court, to Joseph F. Bianco, United States District Judge (Apr. 26, 2010) ("Heinemann Apr. 26 Letter") at 3, ECF No. 84; *see also* Heinemann Jan. 19 Letter at 2.)

### 2. Overview of Barlow's Fair Cross-Section Claim

The 60-person venire for Barlow's trial contained no African-American males. Barlow contends that this resulted from the way in which the Jury Department determines whether a juror should be disqualified because of his or her responses to the questions on the jury questionnaire dealing with whether he or she has been convicted of a felony or is the subject of a pending felony charge. Barlow further contends that the lack of African-American males in his venire violated his right to a jury drawn from a fair cross-section of the community.

### 3. Analysis

The Sixth Amendment entitles criminal defendants to trial by jury. *See* U.S. Const. amend. VI. "[A]n essential component" of the right to trial by jury "is . . . the selection of a petit jury from a representative cross section of the community . . . ." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

In *Duren v. Missouri*, 439 U.S. 357 (1979), the Supreme Court set forth a three-part test to be used to determine whether the fair cross-section requirement has been violated. Under the *Duren* test, a criminal defendant can establish a prima facie case that his fair cross-section rights were violated by showing "(1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." *Berghuis v. Smith*, 130 S. Ct. 1382, 1392 (2010) (citing *Duren*, 493 U.S. at 364). Notably, the defendant need not show discriminatory intent to prevail on a fair cross-section claim. *See United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990).

The Court applies this analysis below and concludes that Barlow has not shown that his Sixth Amendment rights were violated.

### a. Distinctive Group

Barlow contends that African-American males are a distinctive group.

The Supreme Court recently stated that the distinctive group showing in the *Duren* analysis is "in most cases, easily made." *Berghuis*, 130 S. Ct. at 1388. There is no question that African-Americans are a distinctive group for purposes of the *Duren* test. *See, e.g.*, *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996) (stating that African-Americans are "unquestionably distinctive"). Moreover, although never explicitly decided by the Supreme Court or Second Circuit,[22] it is also clear that men are a distinctive group for purposes of the *Duren* test. Specifically, in *Taylor v. Louisiana*, the Supreme Court found that women are a distinctive group for purposes of the fair-cross section requirement and, in doing so, quoted from an earlier Supreme Court decision's statement that "'[t]he truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both . . . . [A] distinct quality is lost if either sex is excluded. The exclusion of one [sex] may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded.'" 419 U.S. at 531-32 (quoting *Ballard v. United States*, 329 U.S. 187, 193-94 (1946)). The rationale in *Taylor* (and *Ballard*) is equally applicable to men as it is to women–if one sex is excluded, the jury is less representative of the community. Thus, African Americans and males each make up distinctive groups for purposes of the *Duren* analysis.

However, the issue in the instant case is a different one—namely, whether a mixed race-gender group—such as African-American males—can constitute a distinctive group under *Duren*. Some courts have concluded that mixed race-gender groups are not distinctive groups under *Duren*. For example, in *United States v. Greer*, 900 F. Supp. 952 (N.D. Ill. 1995), the court found that African-American males were not a distinctive group, reasoning that *Duren* and subsequent cases were intended to "ensur[e] that minority groups which have been historically discriminated against are not systematically excluded from jury pools." 900 F. Supp. at 957. The court went on to state that "*Duren* already covers what are arguably the two largest such groups, African-Americans and women, in a way that reasonably ensures basic fairness and impartiality." *Id*. The court concluded that "recognizing the subgroup of African-American males as a *Duren* distinctive group would amount to pursuing a level and type of representativeness that is simply not demanded by the Sixth Amendment, which requires only a cross-section that is fair, not one perfectly attuned to multiple variables." 900 F. Supp. at 957-58; *accord United States v. Blair*, 493 F. Supp. 398, 407 (D. Md. 1980) (stating "[i]t is doubtful that black males constitute a distinct group within the community" but deciding, "in any event," that African-American males were not substantially underrepresented); *Carle v. United States*, 705 A.2d 682, 685 (D.C. 1998) (stating that "no court has yet held that African-American males constitute a

---

[22] *See United States v. Taylor*, 663 F. Supp. 2d 1157, 1163 (D.N.M. 2009) (noting that the Supreme Court has never addressed whether men are a distinctive group for purposes of the *Duren* test).

'distinctive group' for fair cross-section purposes" but proceeding to decide case on other grounds); *see also United States v. Underwood*, 617 F. Supp. 713, 718-19 (N.D. Ala. 1985) (finding "white males" were not a distinctive group for *Duren* purposes and generally "reject[ing] the concept of adding together 'cognizable groups' so as to make a separate "cognizable group'"); *State v. Carrasco*, 791 A.2d 511, 516-17 (Conn. 2002) (finding Hispanic males were not a distinctive group). One of the main concerns underlying these cases is that, if mixed race-gender groups can qualify as distinctive, than numerous other characteristics—such as ethnicity, religion, and age could be melded together so that fair cross-section violations could be found based on the exclusion of groups that make up a minuscule part of the population. *See, e.g.*, *Underwood*, 617 F. Supp. at 718-19 (expressing concern that "[a] social scientist might, with complete honesty, argue for a merger of the black, female, poor, elderly Catholics and find that the percentage of the group thus combined is terribly underrepresented or terribly over represented in the jury pool.").

On the other hand, at least two state supreme court cases have assumed without deciding that African-American males are a distinctive group. *See Harris v. Commonwealth*, No. 2007-SC-000142-MR, 2008 WL 2484934, at *4 (Ky. June 19, 2008) (unreported case) ("Even assuming that African-American men constitute a distinctive group for jury selection purposes, Harris made no attempt to show that they are regularly under-represented on Jefferson County venires or that the jury selection process systematically excludes them."); *Wright v. State*, 335 S.E.2d 857, 860 n.5 (Ga. 1985) ("In pursuing [the *Duren*] analysis, we pretermit the question of whether black males, as distinct from all blacks, are a cognizable group."). However,

defendant has not cited—and the Court's independent research has not revealed—any cases affirmatively deciding that African-American males are a distinctive group under *Duren*.

In the instant case, this Court need not decide whether African-American males are a distinctive group under *Duren* because, even assuming *arguendo* they were, Barlow has not shown "unfair underrepresentation" or "systematic exclusion" and, thus, cannot prevail on his fair cross-section claim. Thus, the Court assumes without deciding that the "distinctive group" requirement is met in this case.

### b. Unfair Underrepresentation

The second element of the *Duren* test requires the defendant to show that the distinctive group is unfairly underrepresented "in venires from which juries are selected . . . ." *Duren*, 439 U.S at 364. To make this showing, the defendant must establish that the group's representation in the relevant jury pool "is not fair and reasonable in relation to the" group's population in the larger community. *Id*. As set forth below, based upon the undisputed statistical evidence, Barlow has failed to satisfy this requirement.

### (1) Standard

To determine whether a particular group is underrepresented, courts compare the population of the distinctive group in the community as a whole to the group's representation in the relevant jury pool. As such, before it can be determined whether African-American males are in fact underrepresented, the Court must first determine: (1) the relevant population and community; (2) the relevant jury pool and

time period; and (3) the means of measuring underrepresentation. *See United States v. Rioux*, 97 F.3d 648, 656-57 (2d Cir. 1996).

### (a) Relevant Population and Community

The parties agree, at least for purposes of this motion, that the relevant population consists of people age 18 and older residing in the Eastern District of New York and that African-American males make up 8.9% of this population.

### (b) Relevant Jury Pool and Time Period

"The relevant jury pool may be defined by (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three." *Rioux*, 97 F.3d at 657. Here, at various points, defendant has proposed different measures of the relevant jury pool.[23]

For purposes of the pending motion, the Court will consider several pools as the "relevant jury pool." Specifically, the Court will consider the (1) master jury pool; (2) the qualified wheel as of September 11, 2009, the date summonses were issued for the jurors who would eventually make up Barlow's venire; (3) the qualified wheel as of November 17, 2009, using data provided by the Clerk of the Court; and (4) all venires drawn from the September 2009 qualified wheel from the time the wheel

began being used until March 30, 2010.[24]

* * *

The Court will not, however, consider the relevant jury pool to be, as defense counsel suggests, "venires summoned for criminal trials in the Eastern District of New York up to the time of Mr. Barlow's trial, i.e. October 2009." (Margulis-Ohnuma Apr. 23 Letter at 3-4.) There were five such venires, and two of them, including Barlow's, contained no African-American males. Two others contained only two African-American males. The fifth contained over nine percent African-American males. *See id*. at 5.

The Court declines to consider such an artificially limited pool. The *Duren* analysis—which requires the defendant to show "systematic exclusion"—asks whether the process for forming juries deprives a defendant of a jury drawn from a fair cross section of the community. The composition of a particular venire or even several venires is of little value to this analysis. In Barlow's case, there is nothing unique about the process for forming venires for criminal trials in October 2009 as compared to the process for forming any venire—criminal or civil—based on the September 2009 master wheel and qualified wheel.[25]

---

[23] (*Compare* Def.'s Mem. of Law at 37-42 (suggesting the master jury pool is the relevant jury pool) *with* Def.'s Reply Mem. of Law at 20-22 (implying that Barlow's venire is the relevant jury pool) *with* Margulis-Ohnuma Apr. 23 Letter at 3-6 (suggesting additional measures of the relevant jury pool)).

[24] The September 2009 wheel is still operative, and the Clerk of the Court continues to draw venires from it. The Court uses a March 30, 2010 cut off because that is the latest date for which the Court has received data. (*See* ECF No. 80.)

[25] *See generally United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990) ("Of course, the Sixth Amendment assures only the *opportunity* for a representative jury, rather than a representative jury itself, but that opportunity can be imperiled if

In a letter filed with the Court on May 10, 2010, defense counsel suggests otherwise. Implicitly recognizing that the post-October 2009 venires contained, as a whole, higher percentages of African-American males, he suggests "it is essential to explore what changed in the process in the [post-October 2009] period that resulted in so many more black males being summoned" and requests an evidentiary hearing. (Letter from Zachary Margulis-Ohnuma to Hon. Joseph F. Bianco (May 10, 2010), at 2-3 & n.2 ("Margulis-Ohnuma May 10 Letter"), ECF No. 90.)

No evidentiary hearing is necessary. The pending motion—and the fair cross-section issue in particular—has been the subject of numerous submissions by defense counsel, the government, and the Clerk of the Court over an almost-six-month period. A review of these submissions provides no plausible basis for inferring that anything "changed in the process" after October 2009. As of September 11, 2009, the qualified jury wheel contained 6.54% African-American males. (*See*

Margulis-Ohnuma Apr. 23 Letter at 3.)[26] Two months later, as of November 17, 2009, the qualified wheel contained 6.62% African-American males.[27] Thus, the difference between the percentage of African-American males in the qualified jury pool between mid-November 2009 and September 2009 was 0.08% (6.62-6.54). If, following the Barlow venire, the process changed to allow the greater qualification or summoning of African-American males, one would expect to see a much larger difference in the qualified pool.

Moreover, by defendant's own calculations, African-American males made up 6.54% of the qualified wheel as of September 11, 2009, around the time summonses began to be sent out for jury service in October 2009. In addition, African-American males made up 5.6% of the people summoned at random from the qualified wheel for jury service beginning October 13, 2009, the day Barlow's trial began. (*See* Margulis-Ohnuma Aff. ¶ 41.)

---

venires *regularly* lack even the small number of minorities necessary to reflect their proportion of the population." (internal citation omitted) (first emphasis in original; second added). For similar reasons, the Court also declines to consider Barlow's venire, standing alone, as the relevant jury pool. *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 950 (9th Cir. 2007) ("[A] violation of the fair cross-section requirement cannot be premised upon proof of underrepresentation in a single jury.'" (quoting *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985)); *United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997) ("Underrepresentation of a cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the 'systematic exclusion of the group' required by *Duren* . . . ." (collecting cases)).

---

[26] At some points in the record, the parties assert that the qualified wheel at this point contained 6.55% African-American males, not 6.54%. (*Compare, e.g.*, Margulis-Ohnuma Apr. 23 Letter at 3 *with id.* at 4.) However, based on the numbers provided by defendant—10,187 total potential jurors, of whom 666 were African-American males—6.54 is the more accurate number and is also marginally more favorable to defendant's argument. Therefore, the Court uses 6.54.

[27] Although this number was provided by the Clerk of the Court, defendant does not appear to dispute its accuracy. (*See* Letter from Zachary Margulis-Ohnuma to Hon. Joseph F. Bianco, Apr. 2, 2010 ("Margulis-Ohnuma Apr. 2 Letter) at 2, ECF No. 75.)

As discussed in greater detail above, jury venires are formed by random selection from the people who report for jury duty on a particular day. Thus, although African-American males made up only 2.96% of criminal venires in October 2009, these venires were formed—at random—from a qualified wheel that—by defendant's own calculations—was made up of 6.54% African-American males. There is no evidence that this disparity between the percentage of African-American males in the qualified wheel and the percentage of African-American males in October 2009 criminal venires resulted from anything other than the effects of random selection.

In sum, defendant's argument that the relevant jury pool is criminal venires in October 2009 both misconstrues the proper scope of the fair cross-section analysis and the Eastern District jury formation process. Defendant's argument—that "something changed" in the process after October 2009—is belied by defendant's own statistical evidence.

(c) Means of Measuring Underrepresentation

There are several different ways by which courts have measured underrepresentation, and the parties disagree on which one should be used here.

The government seeks to use an absolute disparity approach. "The absolute disparity method measures the difference between the group's representation in the general population" and the relevant jury pool. *Rioux*, 97 F.3d at 655. For example, if a particular group made up ten percent of the population but seven percent of the relevant jury pool, the absolute disparity would be three percent.

A slight modification to the absolute disparity method is the "absolute numbers" method. This approach "measures how many persons of the group you would have to add to a venire to ensure adequate representation. The absolute numbers approach is the average difference in the number of jurors per venire due to the underrepresentation." *Id.* Thus, using the example above, if the absolute disparity is three percent, then approximately two persons would be need to be added to a 60-person jury pool to ensure adequate representation (3% of 60 is 1.8). *See id.*

Defendant prefers that the Court use a comparative disparity approach. The comparative disparity method "'measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service.'" *Rioux*, 97 F.3d at 655 (quoting *Ramseur v. Beyer*, 983 F.2d 1215, 1231-32 (3d Cir. 1992)). "Comparative disparity is calculated by dividing the 'absolute disparity' of a group . . . by the group's percentage of the population and then multiplying by 100%." *Id.* So, using the above example, the comparative disparity would be 30% ((.03/10) * 100).

None of these approaches is perfect. *Berghuis*, 130 S. Ct. at 1393. Different federal courts of appeals have reached different conclusions regarding which approach is best,[28] and this past term, the Supreme Court stated it had "no cause to take sides . . . on the method or methods by which underrepresentation is appropriately

---

[28] *See generally United States v. Royal*, 174 F.3d 1, 6-10 (1st Cir. 1999) (discussing different approaches).

measured." *Berghuis*, 130 S. Ct. at 1393-94.[29]

In the Second Circuit, however, the comparative disparity approach is, at best, disfavored. In *Rioux*, the Second Circuit stated that it had "earlier considered and rejected the comparative disparity test. We see no reason to revisit the issue." 97 F.3d at 655 (citing *United States v. Jenkins*, 496 F.2d 57, 65-66 (2d Cir. 1974)) (internal citation omitted).

Furthermore, in *Rioux*, the Court indicated that the absolute disparity/absolute numbers approach should be used absent special circumstances. *Rioux*, 97 F.3d at 656 (acknowledging that the court had "admittedly waffled" on the issue in the past); *United States v. Byors*, No. 2:06-cr-39, 2008 WL 444548, at *4 (D. Vt. Feb. 15, 2008) ("The Second Circuit has conditionally approved the use of the absolute disparity/absolute numbers statistical approach to assessing underrepresentation."); *United States v. Barnes*, 520 F. Supp. 2d 510, 514 (S.D.N.Y. 2007) ("[T]he absolute disparity approach is the primary approach used in this Circuit.").

To understand the circumstances in which the absolute disparity/absolute numbers approach might not apply, some background is necessary. Three Second Circuit cases—*United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990), *United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995), and *Rioux*—are instructive.

### i) *Biaggi*

The earliest case, *Biaggi*, involved a challenge to the use of voter registration lists to form the master jury wheel in the Southern District of New York. There was a 3.6% absolute disparity for African-Americans and 4.7% absolute disparity for Hispanics. 909 F.2d at 677 (citing *United States v. Biaggi*, 680 F. Supp. 641, 647, 652 (S.D.N.Y. 1988)). In terms of absolute numbers, two African-Americans and two to three Hispanics would need to be added to a typical venire to eliminate underrepresentation. *Id.* at 678. The Second Circuit found no unfair underrepresentation but stated that "the facts of this case press the . . . 'absolute numbers' approach to its limit, and [we] would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists." 909 F.2d at 678. The Court did not, however, suggest an alternative approach.

### ii) *Jackman*

Five years after *Biaggi*, in *Jackman*, the defendant challenged the jury formation procedures used in the District of Connecticut's Hartford Division. Before Jackman's trial, an unrelated District of Connecticut case had found that the Hartford Division's procedures violated the fair cross-section requirement because they (apparently inadvertently) omitted the cities of Hartford and New Britain, the cities in the division with the highest African-American and Hispanic populations. Nevertheless, when the time

---

[29] *Berghuis* was a habeas corpus case brought under 28 U.S.C. § 2254. The Sixth Circuit had granted the petitioner habeas relief. It had held that the Michigan Supreme Court unreasonably applied clearly established federal law in finding that Kent County, Michigan's procedures for assigning prospective jurors to different courthouses were permissible under *Duren*. The Supreme Court reversed. It found that the Michigan Supreme Court's resolution of the issue "was not at all unreasonable, [and] the Sixth Circuit had no warrant to disturb it." 130 S. Ct. at 1388.

came to summon a venire for Jackman's trial, the jury clerk relied in large part on the previously discredited procedures. After being convicted, Jackman challenged the jury-formation procedures, arguing that the absence of African-American and Hispanic jurors violated the fair cross-section requirement.

In reviewing Jackman's fair cross section claim, the Second Circuit declined to apply the absolute disparity/absolute numbers approach for three reasons. First, the minority population in *Jackman* was a tiny percentage of the overall population—voting age African-Americans made up only 6.34% of the population and voting age Hispanics only 5.07%. *Jackman*, 46 F.3d at 1247. Second, in *Jackman*, the court noted that the circumstances—specifically the reliance on a previously discredited jury wheel— were "far less benign than those in *Biaggi*." *Id.* Finally, there was insufficient data available in *Jackman* to apply the absolute numbers approach. *Id*. at 1247-48. Although the court found unfair underrepresentation in *Jackman*, it did not explicitly adopt an alternative approach but, in a footnote, undertook a statistical analysis regarding the likelihood that a venire would include no African-Americans or Hispanics. 46 F.3d at 1247 n.5; *see also Rioux*, 97 F.3d at 655 (explaining that the statistical analysis in *Jackman* "was not per se dispositive").

### iii) *Rioux*

Less than two years after *Jackman*, in *Rioux*, the Second Circuit reaffirmed that the absolute disparity/absolute numbers approach should be used as a general rule. Moreover, in *Rioux*, the Court implied that the absolute disparity/absolute numbers approach should be abandoned only when multiple factors counsel against its use. *See* 97 F.3d at 656 ("While the

central flaw of the absolute disparity/absolute numbers is admittedly present here, it is equally true that a small minority population alone is not enough to preclude the absolute numbers method. In *Jackman*, the court spurned the absolute numbers approach, not just because the minority population was small, but because: (1) the underrepresentation did not arise from a 'benign' voter registration list; and (2) because some important data was missing, there were no effective means of review." (internal citations omitted)).

Here, there is no reason to abandon the absolute numbers/absolute disparity approach. First, African-American males do not make up a such a small percentage of the Eastern District's population that use of the absolute disparity/absolute numbers approach would be inappropriate. The parties agree that African-American males make up 8.9% of the relevant population. In *Rioux*, African-Americans and Hispanics made up an even smaller percentage of the population—8.33% and 5.1% respectively. 97 F.3d at 656. Nonetheless, in *Rioux*, the court still applied the absolute numbers approach.

Second, the circumstances of the disparity here are more "benign" than those in *Jackman* and even *Biaggi*. In *Biaggi*, the master jury pool was formed solely through voter registration records. *See* 909 F.2d at 676-77. Here, both voter registration lists and Department of Motor Vehicles records are used, presumably so that the master wheel is made up of an even greater cross section of the community than the master wheel in *Biaggi*. To the extent defendant takes issue with the way the qualified wheel is formed, *see infra*, the procedures for formation of the qualified wheel are facially neutral, and federal law requires the disqualification from jury service of felons and those with a pending

felony charge. There is no evidence that the jury pool is formed largely by the whims of the jury clerk or that the selection procedures at issue are apt to exclude wholesale segments of the population, as was the situation in *Jackman*.

Finally, unlike *Jackman*, there is sufficient data here to apply the absolute numbers/absolute disparity approach to all of the arguably relevant jury pools.

Thus, the Court will use the absolute disparity/absolute numbers method.

### (2) Calculations

Applying the absolute disparity/absolute numbers approach to each of the potentially relevant jury pools yields the following results:

### (a) Master Jury Pool

The master pool contains 4.64% African-American males. (Margulis-Ohnuma Apr. 23 Letter, at 4.)[30] Thus, for the master jury pool, the absolute disparity is the difference between 8.9%, the percentage of African-American males in the relevant overall population, and 4.64. Thus, the absolute disparity is 4.26%.

Applying the absolute numbers approach, between two and three African-American males would have to be added to a typical 60-person venire to achieve representation consistent with the African-American male population (4.26% of 60 is 2.56).

### (b) Qualified Wheel

As noted above, the parties have supplied two different measures of the qualified wheel. The first is as of September 11, 2009, the date summonses were sent out for potential jurors to report on the first day of Barlow's trial. At this point, the qualified wheel consisted of 6.54% African-American males. (*See id.*) Thus, the absolute disparity was 2.36%, and the absolute number, for a 60-person venire, was 1.42.

As of November 17, 2009, the qualified wheel contained 6.62% African-American males. (*See* Heinemann Apr. 5 Letter.) Thus, at this point, the absolute disparity was 2.28% (8.9-6.62), and the absolute number was 1.37.

### (c) Venires

African-American males comprised 6.79% of all venires formed using the master and qualified wheel initiated in September 2009 from the wheels' inception until March 30, 2010. (Heinemann Apr. 26 Letter at 3.) Thus, here, the absolute disparity is 2.11% (8.90-6.79), and the absolute number is 1.27.

### (3) Application

These figures fall well short of establishing that African-American males are unfairly underrepresented. Even the highest number—the 4.26% absolute disparity in the master pool—is less than the 4.7% figure the Second Circuit found troubling but acceptable in *Biaggi*.[31] Moreover, as noted above, the master pool here is "more benign" than the

---

[30] In earlier submissions, defendant had taken the position that the master jury wheel contained 4.2% black males. (*See* Def.'s Mem. of Law at 35-36.) Using this figure would yield an absolute disparity of 4.7% and an "absolute number" of 2.82.

[31] Even using defendant's earlier figure, *see supra* note 30, the absolute disparity would be equal to the 4.7% found acceptable in *Biaggi*.

master pool in *Biaggi* because here the master pool is formed using not only voter registration lists but also Department of Motor Vehicles records.

The absolute disparities for the other potential jury pools—the qualified wheel and the venires—range between 2.36% and 2.11%. The absolute numbers for these pools range between one and two. These numbers are similar to the absolute disparities of 2.08 and 2.14 and the absolute numbers of between two and three that the Second Circuit found permissible in *Rioux*. *See* 97 F.3d at 658 (stating that "such meager numbers do not present an infirmity of constitutional magnitude").

Other courts, both before and after *Rioux*, have found that absolute disparities larger than the absolute disparities here did not meet the "unfair underrepresentation" standard. *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 950 (9th Cir. 2007) (indicating that 4.15% absolute disparity for Native Americans was constitutionally permissible); *United States v. Orange*, 447 F.3d 792, 798 (10th Cir. 2006) (finding 3.57% absolute disparity fell "far short" of Sixth Amendment violation); *United States v. Royal*, 174 F.3d 1, 10-11 (1st Cir. 1999) (concluding that 2.97% absolute disparity was not constitutionally significant); *United States v. Gault*, 141 F.3d 1399, 1403 (10th Cir. 1998) (finding no substantial underrepresentation based on 7% absolute disparity for Hispanics); *United States v. Cannady*, 54 F.3d 544, 548 (9th Cir. 1995) ("This court has consistently held that absolute disparities below 7.7% are insubstantial and constitutionally permissible."); *United States v. Barnes*, 520 F. Supp. 2d 510, 515 (S.D.N.Y. 2007) (finding no unfair underrepresentation where there was a 2.8% absolute disparity for African Americans and a 2.3% disparity for Hispanics which would require addition of one to two African Americans and one to two Hispanics to a 60-person venire in order to reach proportionality). *See generally Ramseur v. Beyer*, 983 F.2d 1215, 1232 (3rd Cir. 1992) (en banc) (collecting cases and noting "[c]ourts addressing the question of whether a given absolute disparity constitutes 'substantial underrepresentation' have held that absolute disparities between 2.0% and 11.5% do not constitute substantial underrepresentation"). Indeed, several federal courts of appeals have required the absolute disparity to meet a 10% threshold before finding unfair underrepresentation. *See, e.g.*, *United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001) ("[W]e have noted that 'a discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire.'" (quoting *United States v. Ashley*, 54 F.3d 311, 314 (7th Cir.1995) (citation omitted))); *United States v. Grisham*, 63 F.3d 1074, 1078-79 (11th Cir. 1995) ("If the absolute disparity . . . is 10 percent or less, the second element is not satisfied."); *United States. v. Taylor*, 663 F. Supp. 2d 1157, 1165 (D. N.M. 2009) (finding no substantial underrepresentation based on 4.7% absolute disparity and noting that this figure was far lower then the 10% threshold set by the Tenth Circuit for finding underrepresentation).[32] In

---

[32] Even the figures under the comparative disparity approach fall short of establishing a constitutional issue. The comparative disparities here are 47.9% (master pool); 26.5% (qualified wheel as of 9/11/09); 25.6% (qualified wheel as of 11/17/09); and 23.7% (venires). *Cf. United States v. Orange*, 447 F.3d 792, 798 (11th Cir. 2006) (finding no fair cross-section violation where comparative disparities ranged between 38% and 51%); *United States v. Weaver*, 267 F.3d 231, 243 (3d Cir. 2001) (finding no substantial

sum, Barlow has not shown that African-American males were substantially underrepresented in any of the relevant jury pools.

### c. Systematic Exclusion

Even if Barlow could establish that African-American males were substantially underrepresented, he would still need to establish that this underrepresentation resulted from the systematic exclusion of African-American males in the jury-formation process. *See Berghuis*, 130 S. Ct. at 1392 (explaining that a defendant must show that "systematic exclusion accounts for the underrepresentation."). As set forth below, Barlow has not satisfied this requirement.

### (1) Standard

Systematic exclusion occurs "when the underrepresentation is due to the system of jury

_____

underrepresentation, even though comparative disparities ranged between 40.01% and 72.98%, because minority groups in question made up a very small percentage of the population, and, thus, comparative disparity was exacerbated); *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) ("In the present case, [defendant] presents evidence that blacks, who account for 7.9% of the district's population, have a comparative disparity of 40.89%, while Hispanics, who make up 2.74% of the district's population, have a comparative disparity of 58.39%. These proportions of relative group size and comparative disparity here do not establish a prima facie violation."). Thus, under any approach, Barlow cannot satisfy the "unfair underrepresentation" requirement based upon the undisputed statistical evidence in this case.

selection itself, rather than external forces." *Rioux*, 97 F.3d at 658.

Cases finding systematic exclusion are few and far between. *See generally United States v. Reyes*, 934 F. Supp. 553, 557 (S.D.N.Y. 1996) (explaining that the systematic exclusion prong is "usually the most difficult to establish. In this circuit, that element may be satisfied by showing that substantial underrepresentation of distinctive groups occurred over a significant time period"). In *Jackman*, the Second Circuit found systematic exclusion where, as discussed above, the jury clerk selected most of the potential jurors from a jury pool that omitted the entire cities of Hartford and New Britain. 46 F.3d at 1248. In *Gibson v. Zant*, 705 F.2d 1543 (11th Cir. 1983), the Eleventh Circuit found systematic exclusion in a process where one criteria for jury service was that jury commissioners deem potential jurors to be "intelligent and upright." *Gibson*, 705 F.2d at 1548 ("The district court's description of the procedure employed by the jury commissioners of Jones County demonstrates that the disparity occurred at the point in the process when the commissioners selected names based on their subjective judgment about which individuals were intelligent and upright."). In *Duren* itself, systematic exclusion occurred when a provision of the Missouri constitution allowed women to be automatically exempt from jury service upon request. *See* 439 U.S. at 360 & n.8. The Court found that this resulted in "a large discrepancy . . . not just occasionally but in every weekly venire for a period of nearly a year . . . ." 439 U.S. at 366.

### (2) Application

As discussed in detail below, the circumstances in this case are not even remotely analogous to those in the cases cited

above, all of which involved inherent, facial defects in the jury formation process. The process at issue here suffers from no such flaws, and, accordingly, defendant has not shown systematic exclusion.

### (a) Master Jury Pool and Venires

The master jury pool is formed based on motor vehicles and drivers' license records. As noted above, it appears drivers' license records are included to ensure a greater cross section of the community is represented. Under these circumstances, Barlow has not shown any systematic exclusion occurred in the forming of the master jury wheel. *Cf. United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000) (finding defendant "failed to establish a prima facie case because he made absolutely no showing that African Americans were systematically excluded or that the district court's use of voter registration and motor vehicle bureau lists to select the venire results in unfair underrepresentation"); *see also Duren*, 439 U.S. at 366 ("There was no indication that underrepresentation of women occurred at the first stage of the selection process—the questionnaire canvass of persons randomly selected from the relevant voter registration list."); *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1998) ("The use of voter registration lists 'has been consistently upheld against both statutory and constitutional challenges, unless the voter list in question had been compiled in a discriminatory manner.'" (quoting *United States v. Cecil*, 836 F.2d 1431, 1445 (4th Cir.1988) (en banc))); *United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997) ("[A]bsent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection"

(internal quotations and citation omitted).) In sum, there is absolutely no basis for finding systematic exclusion in the formation of the master jury wheel.

Similarly, despite the fact that no African-American males were in Barlow's venire, there is no evidence of systematic exclusion in the formation of the venires—which are formed at random from the individuals in the qualified wheel summoned to report to court on a given day. *See, e.g.*, *United States v. Bullock,* 550 F.3d 247, 251-52 (2d Cir. 2008) (finding defendant had not established systematic exclusion even though none of 100 venirepersons were African American); *United States v. Horne*, 4 F.3d 579, 587 (8th Cir. 1993) ("'A discrepancy on a single venire panel cannot demonstrate systematic exclusion'" (quoting *United States v. Womack*, 985 F.2d 395, 397-98 (8th Cir. 1993))); *United States v. Guy*, 924 F.2d 702, 706 (7th Cir. 1991) ("[Defendant's] mere observation that there were no African-Americans on a panel that was drawn from a population containing African-Americans simply is not sufficient to demonstrate any systematic exclusion."); *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *Perry v. Miller*, No. 96 CV 5887, 1998 WL 426721, at *4 (E.D.N.Y. June 12, 1998) ("Evidence of a discrepancy on a single venire panel does not establish systematic exclusion."); *see also United States v. Bryant*, 523 F.3d 349, 362 (D.C. Cir. 2008) (explaining that underrepresentation in a single venire is not sufficient to establish systematic exclusion (citing *United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997))).

### (b) Qualified Wheel

Nor is there evidence of systematic exclusion in the process by which the

qualified wheel is formed. Preliminarily, the Court notes that African-American males actually make up a higher percentage of the qualified wheel than of the master pool. African-Americans males made up 4.64% of the master pool but 6.54% of the qualified wheel as of September 11, 2009. Thus, African-American males were actually deemed qualified for jury service at a higher rate than other groups were. This alone casts serious doubt on whether systematic exclusion of African-American males occurred in the juror qualification process.

### i) Barlow's Argument

Nonetheless, defendant maintains that African-American males were systematically excluded from jury service. Defendant's theory is premised on the fact, discussed above, that both the Jury Act and the Eastern District Jury Plan require the disqualification from jury service of people who have either (1) a felony charge pending against them, or (2) have been convicted of a felony and have not had their civil rights restored.

Whether a juror should be disqualified based on a prior or pending felony charge is determined by how the potential juror responds to questions five through seven on the jury questionnaire. These questions ask:

> 5. Are any charges now pending against you for a violation of state or federal law punishable by imprisonment for more than one year?

> 6. Have you been convicted, either by your guilty or nolo contendere plea or by a court or jury trial or, of a state or federal crime for which punishment could have been more than one year in prison?

> 7. ("If Yes") Were your civil rights restored?

If a potential juror answers "yes" to questions five, six, or seven, he is instructed to explain on the reverse side of the jury questionnaire.

Barlow contends that the Jury Department's practice is to (1) automatically exclude people who answer "yes" to questions five or six, regardless of whether or not the person provided an adequate explanation on the back of the form but also (2) to presume that a person's civil rights have not been restored, even if the person answers "Yes" to question seven, unless the person provides documentation showing that his civil rights have in fact been restored. (*See* Def.'s Reply Mem. of Law at 27-29.)

Barlow further asserts that these alleged practices disparately impact African-American males and result in their systematic exclusion from jury service. In support of this argument, Barlow's counsel provides the results of his office's review of 13,344 questionnaires of jurors who had been disqualified from the jury pool as of September 11, 2009. (*See* Margulis-Ohnuma Aff. ¶ 45.) From this group, Barlow's counsel identified 219 jurors who were disqualified on the basis of criminal history but, according to him, should have been qualified because they either (1) answered they had been convicted of a felony but listed a crime that was actually a misdemeanor or other non-felony offense; (2) answered that they had been convicted of a felony but provided insufficient explanation; or (3) answered they had been convicted of a felony but also checked the box indicating that their civil rights had been restored. (*See*

Randell Aff. ¶ 3.)[33]

This group of 219 contained 55 African-American males. (Margulis-Ohnuma Aff. ¶ 52.). Of these 55 African-American males, Barlow's counsel asserts that ten had actually been convicted of a misdemeanor, 18 failed to provide adequate explanation, and 27 indicated that their civil rights had been restored. Barlow contends that all 55 were erroneously disqualified from jury service. Conversely, the government contends that 50 of these 55 individuals were properly disqualified. (*See, e.g.*, Govt.'s Mem. of Law at 58-61.)

### ii) Discussion

The Court makes two preliminary observations. First, all 55 of the people in question checked "Yes" to the questions five or six on the jury questionnaire. That is, all of them answered that they had been convicted of a felony or had a felony charge pending against them. Second, unlike the exemptions or excuses in the Jury Plan, the disqualification of people with a felony conviction or pending felony charge is required by federal law. *See* 28 U.S.C. § 1865(b)(5). Thus, even accepting *arguendo* defendant's theory that the jury clerk applied a presumption of disqualification to anyone who answered "yes" to question five or six, it should be noted that the erroneous

*qualification* of someone who had been convicted of a felony or had a felony charge pending would contravene federal law.[34]

### a) The 55 Allegedly Erroneous Disqualifications

After an independent review of the relevant juror questionnaires, the Court also rejects defendant's contention that all 55 of these individuals were erroneously disqualified.

With respect to the subset of 18 people who Barlow contends checked "yes" to question five or six but provided insufficient explanation for the Jury Department to conclude they had been convicted of a felony, the Court disagrees with defense counsel's

---

[33] The Randell Affirmation was filed under seal to protect the identity of the prospective jurors (and their corresponding personal information, including addresses) contained in the individual questionnaires attached to the affirmation. Although the Court makes reference by necessity in this Memorandum and Order to certain information contained in those questionnaires, it does so without referencing the names of the particular prospective juror, thereby protecting their identities and privacy.

[34] Courts have rejected defendants' arguments that the exclusion of felons or those charged with a felony violates the fair cross-section requirement or equal protection. *See, e.g.*, *United States v. Barry*, 71 F.3d 1269, 1274 (7th Cir. 1995) ("Even were the prima facie case made, we would find . . . that the governmental interest in juror probity outweighs a defendant's interest in having a jury which could include someone accused of a felony."); *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir. 1993) ("We have no trouble concluding that § 1865(b)(5) is constitutional. The constitutionality of § 1865(b) is subject to rational basis review."); *United States v. Greene*, 995 F.2d 793, 798 (8th Cir. 1993) (holding that, even if defendant established prima facie fair cross section violation based on the exclusion of persons charged with—but not convicted of—felonies, exclusion was permissible based on "the significant governmental interest in having jurors who can be relied upon to perform their duties conscientiously, and in accordance with the law"); *United States v. Foxworth*, 599 F.2d 1, 4 (1st Cir. 1979) (upholding § 1865(b)(5) using rational basis review).

conclusion regarding a number of these 18 forms. Although the jury questionnaire instructs people answering "yes" to questions five or six to provide (1) the date of the offense, (2) the date of conviction or pending charge, (3) the nature of the offense, (4) the sentence imposed, and (5) the name of the court, a number of these 18 people provided sufficient detail for one to reasonably conclude that the person had, in fact, been convicted of a felony, even if they did not strictly comply with the form's instructions. For example, among the potential jurors defendant contends were erroneously disqualified include people who wrote the following:

• "I was convicted of a robbery in 2003 and sentenced to 3 ½ - 7 ½ years in state prison. I just came home 1/3/09." (Juror Questionnaire 102947465.)

• "Charges: Asslaut [sic] 2nd, Richmond County Courts." (Juror Questionnaire 102542658.)

• "Robbery 1st Class B Criminal Court Date of Conviction [Month and date omitted]/2001 Date of Release [month and date omitted]/2009." (Juror Questionnaire 102701124.)

To the extent defendant contends that these potential jurors should have provided some form of documentation, the instructions on the jury questionnaire form also state "[d]o not attach anything to this form. Please write your comments on the 'Remarks' section."

Moreover, some of the individuals defendant contends were erroneously disqualified may have been disqualified, excused, or exempted on other grounds. For example, one person who defense counsel claims was erroneously disqualified on the basis of a misdemeanor conviction also stated that he could not speak English, which is also cause for disqualification. (*See* Juror Questionnaire 102608941.) Other individuals defendant contends were erroneously disqualified include the following:

• a person who was over age 70 and therefore could be excused under the District's Jury Plan. (Juror Questionnaire 103015401)

• a person who was "currently in a nursing home . . . not able to read, write, and speech was also affected–slurred" (Juror Questionnaire 103015756.);

• a person "on weekly treatment for cancer, V.A. Med Center Brooklyn, New York, 800 Poly Place [phone number]" (Juror Questionnaire 102553907.); and

• a person "unable to speak currently receiving radiation for cancer every day." (Juror Questionnaire 102853988.).

Although none of these last three individuals answered "yes" to a question regarding whether they had a physical disability, it is plausible they were, in fact, excused from jury service because they were deemed "incapable, by reason of mental or physical infirmity, to render satisfactory jury service." Jury Plan § 9(5).

Finally, with respect to the 27 individuals

who were disqualified even though they answered "yes" to Question 7, which asked if their civil rights had been restored, only three of these individuals provided remarks on the back of the form that were directed at Question 7.[35] Although, at oral argument, the parties disputed what exactly was required for one's civil rights to be restored, it is clear that in New York State, merely completing one's sentence does not restore the right to sit as a juror. *Cf. Bullock*, 550 F.3d at 250 (noting that a previously convicted defendant's right to serve on a jury had not been restored because "he was not pardoned; and none of his prior convictions were expunged")*; see also* N.Y. Jud. Law § 510.3 (excluding those who have been "convicted of a felony" from jury service). Moreover, the Eastern District Jury Plan explicitly requires a "pardon" or "amnesty" before civil rights are restored. *See* Jury Plan § 9 (explaining that a person convicted of a felony is disqualified from jury service unless his "civil rights have . . . been restored by pardon or amnesty"). Here, none of the 27 individuals provided any evidence of a pardon, amnesty, or other affirmative act by the state that restored their civil rights. Thus, it was not unreasonable for the jury clerk to conclude that these individuals had not had their civil rights restored.

In sum, after reviewing the 55 questionnaires, the Court disagrees with defense counsel's assertion that the Clerk's office "mishandled" the "vast majority"[36] of juror questionnaires in which potential jurors were disqualified based on their answers to questions five or six. To the contrary, the Jury Department's determination that many, if not most, of these individuals were unqualified for jury service was reasonable, appropriate, and certainly not indicative of constitutional error in the juror qualification process.[37]

---

[35] (Juror Questionnaires 102784895; 102623124; 102672508.) The latter two questionnaires indicated that the basis for their belief that their civil rights had been restored was that they had been released from prison. 102623124 ("only served ninty [sic] days, my rights [were] restored"); 102672508 ("Time served/Parole, Completed over 30 years ago"). The first individual simply wrote "7-Drugs." (Juror Questionnaire 102784895.) Additionally, one person categorized by defendant as being erroneously excluded because his civil rights had been restored in fact answered "no" to Question 7 but stated on the back of the form that "I don't know what you mean by civil rights being restored so I put no as an answer." (Juror Questionnaire 102868300.)

[36] (*See* Margulis-Ohnuma Aff. ¶ 51.)

[37] Defendant also contends that a further 56 African-American males were erroneously disqualified for reasons other than their answers to questions five or six. He contends that these disqualifications "had the effect of exacerbating the impact of the systematic discriminatory exclusion that resulted from the handling of the criminal history questions." (Margulis-Ohnuma Aff. ¶ 53.) Both the Clerk of Court and the government have asserted that many of these individuals were properly disqualified, excused, or exempted. (*See, e.g.*, Heinemann Apr. 26 Letter at 3 (describing defense counsel's analysis of these questionnaires as "seriously flawed"); Letter from Amir H. Toosi to Hon. Joseph F. Bianco (Apr. 2, 2010), ECF No. 76.) In any event, the Court finds that the disqualification of these 56 potential jurors does not raise an inference of systematic exclusion. First, it is not at all clear that the rate of erroneous disqualifications was higher for African-American males than for other groups, although defense counsel attempts to argue otherwise based on the government's limited review of disqualified, non-African-American male juror questionnaires. (*See* Margulis-Ohnuma Apr. 23 Letter at 15-16.)

b) Alleged Disparate Impact of the Felony
Exclusion on African-American Males

Even accepting *arguendo* defendant's
assertions[38] that the Jury Department's
practices with respect to felony
disqualifications led to (1) at least some
erroneous exclusions and (2) that African-
American males were disproportionately
affected by these practices, it does not follow
that systematic exclusion occurred.

As noted above, systematic exclusion occurs
where "the underrepresentation is due to the
system of jury selection itself, rather than
external forces." *Rioux*, 97 F.3d at 658; *accord
Duren*, 439 U.S. at 366 (stating that
"systematic exclusion" must be "inherent in the
particular jury-selection process utilized").
Thus, systematic exclusion does not occur
simply because a facially neutral
disqualification criterion disproportionately
impacts a particular group.

In *Rioux*, for example, defendant argued that
the systematic exclusion occurred because of
the jury clerk's "overuse" of the
disqualification for non-English speakers. The
Second Circuit rejected this argument,
recognizing the propriety of "reasonable
qualifications and exemptions" and stating that

the "requirement that jurors speak English is
unquestionably reasonable, and was in no way
abused by the District of Connecticut." 97
F.3d at 659.

Similarly, in *United States v. Ireland*, 62
F.3d 227 (8th Cir. 1995), a defendant mounted
a fair cross-section challenge arguing that the
use of voter registration lists to select grand
jurors systematically excluded Native
Americans because Native Americans were
less likely to vote than others. The Eighth
Circuit rejected this claim, reasoning that the
defendants "claim[ed] neither the use of
suspect voter-registration qualifications or
discriminatory administration of the
jury-selection procedure." 62 F.3d at 232;
*accord Truesdale*, 142 F.3d at 755 (rejecting
defendant's argument that substantial
underrepresentation of African Americans on
voter registration records was, by itself,
sufficient to establish systematic exclusion).

Likewise, here, defendant has not shown
any defect "inherent in the particular jury-
selection process utilized," *Duren*, 439 U.S. at
366, such that the process systematically
excludes African-American males. First, as
noted above, the exclusion of convicted felons
and those with pending felony charges is
required by federal law and has been upheld
by other federal courts. *See supra* note 34.

Second, defendant has not shown abuse of
the felony disqualification criteria by the Jury
Department. Even assuming there were some
errors in the application of the criteria, it is
undisputed that all of the individuals in
question answered "yes" when asked if they
had been convicted of a felony or had a felony
charge pending. Additionally, the
qualification process involved the review of
over 20,000 questionnaires in a roughly two-
month period. (*See* Heinemann Jan. 19 Letter

---

Second, even assuming that this did occur, there is
absolutely no evidence of disparate treatment here,
particularly because, as noted above, the Jury
Department deemed African-American males
qualified for jury service at a *higher* rate than the
rest of the population. Nor is there evidence of any
other systematic aspect of the jury formation
process that would result in the disproportionate
erroneous disqualification of African-American
males.

[38] (*See* Margulis-Ohnuma Aff. ¶ 52; *see also id.* ¶
44.)

at 2.) Under these circumstances, it was not unreasonable to presume that someone who said they had been convicted of (or charged with) a felony had, in fact, been convicted of (or charged with) a felony.[39]

Third, as defendant implicitly acknowledges, the Jury Department apparently disqualified anyone, regardless of race or gender, who checked "yes" to questions five or six. (*See* Margulis-Ohnuma Aff. ¶ 52.) Moreover, again, African-American males as a whole were actually qualified at a higher rate than the rest of the population. Given the neutral application of the criteria for disqualifying people on the basis of purported felony status and the overall higher rate of qualification for African-American males as a whole, there is no evidence of discriminatory treatment.[40]

In sum, with respect to the "systematic exclusion" requirement, this is not a case like *Duren* where the underrepresentation occurred because women were allowed an exemption from jury service simply because they were women. Nor is it a case like *Jackman* where the underrepresentation occurred because the jury clerk relied on a jury wheel knowing that the wheel omitted large segments of the division's minority population. Here, even viewing the record in a light most favorable to defendant, he has not met the high bar required to show systematic exclusion.

* * *

Accordingly, defendant's fair cross-section claim fails because he has shown neither (1) unfair underrepresentation nor (2) systematic exclusion.

---

[39] Nor is there a Sixth Amendment issue because, when a potential juror asked to be excused from jury service based on child-care responsibilities, the Jury Department would return the jury questionnaire to the person and ask them to submit supporting documentation. (*See* Margulis-Ohnuma Aff. ¶ 43.) First, nothing in either the Jury Act or Jury Plan requires the Jury Department to request supporting documentation in certain instances. It would be anomalous to find a Sixth Amendment violation because, presumably in an effort to qualify more people for jury service, the Jury Department asked for documentation in some cases. Second, as noted above, excuses and exemptions—such as the child-care excuse—differ from disqualifications such as felony status in that disqualifications are required by federal law. Third, to the extent defendant argues that a "double standard" applied to the felony disqualification, the felony disqualification was not the only disqualification, exemption, or excuse where people were disqualified without further inquiry. (*See* Margulis-Ohnuma Aff. ¶ 44.) Finally, as a practical matter, Barlow's venire was one of the first called using the September 2009 qualified wheel. Thus, even if the Jury Department had returned questionnaires to people who had stated they were felons (or had been charged with a felony) and asked them to return additional clarifying information, it is questionable how many of these questionnaires would have been returned to the Jury Department by September 11, 2009, the day summonses were sent out for Barlow's venire.

[40] As noted above, discriminatory intent is not required for a fair cross-section violation. However, clearly, if there was purposeful discriminatory treatment, it would be highly relevant in determining whether a fair cross-section violation occurred.

IV. CONCLUSION

For the reasons set forth above, defendant's Rule 33 motion is denied in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 5, 2010
Central Islip, New York

* * *

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY 11201 by Amir H. Toosi, Assistant U.S. Attorney. Defendant Barlow is represented by Zachary Margulis-Ohnuma, 260 Madison Avenue, 18th Floor, New York, NY 10016.